**CACTUS DRILLING COMPANY,**
**Appellant,**

v.

**Ruller D. WILLIAMS, Appellee.**

No. 8545.

Court of Civil Appeals of Texas,
Amarillo.

· June 30, 1975.

Rehearing Denied July 31, 1975.

Crenshaw, Dupree & Milam (Cecil C. Kuhne and William R. Moss), Lubbock, for appellant.

Warren Burnett Associated (Richard J. Clarkson), Odessa, for appellee.

REYNOLDS, Justice.

In this common-law action to recover damages for personal injury received when a pipe fell on his hand, plaintiff secured a favorable jury verdict upon which judgment in his favor was entered. A defective submission of essential elements in the case operates to vacate the judgment. Reversed and remanded.

An oil well, the owner of which was identified as Pan Am, had been drilled in Yoakum County by, and it was under the control of, defendant Cactus Drilling Company.

A Sherman Power Tongs crew had run casing into the well. Plaintiff Ruller D. Williams was one of a four-member Byron-Jackson, Inc., crew on the site to cement the well.

The cement was to be pumped from the Byron-Jackson pump truck through a connected two inch, twenty to thirty foot steel pipe, constructed with swivel joints to achieve flexibility, into and through a cement head suspended from the oil derrick some twenty-five feet above the drill rig floor and thence into the casing that had been placed in the hole. It was necessary that the pipe connected to the pump truck be raised from the drill rig floor for attaching to the cement head by means of a catline operated from a cathead. A cathead is an engine-powered revolving drum around which is wound a catline which, in this instance, was described as a rope with a length of cable on the loose end. The cathead was owned by Cactus and, according to Williams, was being operated by an employee of Cactus, whose employees usually operated it. The cementing operation was at the direction of a member of the Byron-Jackson crew stationed in the derrick.

During the afternoon of 16 January 1970, as the Cactus employees were in the process of changing crews, John Bland, a member of the Byron-Jackson crew, attached the catline to the pipe with the assistance of Williams and another member of the Byron-Jackson crew. Before the pipe had been raised to the cement head, the cable, which apparently was too long, engaged the drum and the pipe could not be raised higher. The pipe was lowered to the drill rig floor where some slack was taken out of the cable.

Some person whose identity is disputed, and who acted without being requested to do so by anyone, obtained a chain with a hook on its end from the muddy drill rig floor, wrapped the chain around the catline several times and secured it with a timber hitch tie, and connected it to the pipe. No

witness knew the name of the person who made this second connection. Although Williams had deposed a year after the occurrence that he did not know if it was the casing crew or a Cactus employee who made the second connection, he testified at the trial in June of 1974 that a Cactus employee made the connection. Williams readily agreed that all three crews were around the drill rig floor at the time. Bland said he was sure the hookup was made by an employee of Cactus but, when pressed, he stated that he did not know but presumed the person was a Cactus employee. He knew the four Byron-Jackson crew members and said that the tie was not made by a Byron-Jackson man. He further declared that the casing crew had gone inside the doghouse to get warm, that they were not on the drill rig floor, and that they never help in the operation. Frank Cochran, a driller for Cactus who observed the scene after the second connection had been made when he came out of the doghouse where the crew changed clothes, testified that to the best of his knowledge none of the Cactus employees were on the drill rig floor at the time. A tool pusher for Cactus, Glenn Simpson, testified that although the normal procedure was for the Byron-Jackson crew to connect the catline to the pipe, he did not know who made the second connection. He was in the doghouse when he saw the pipe falling, at which time he saw five or six or seven people on the rig floor.

The timber hitch tie was described as the wrapping of the chain around the catline several times and tying it with a double half hitch. The pressure exerted by raising the catline tightens the hitch to secure the connection with the pipe. Bland, who watched the person tie the timber hitch, testified that he told the person, "(W)e never had done it like this before," and "that won't work." Williams saw the connection being made and saw nothing wrong with it. He said he made no objection because he was not familiar with it and he did not

know how to do it, although he admitted he had seen these types of connections used many times before in the oil fields. Simpson's testimony was that, although it may not have been standard procedure in the oil field, a timber hitch had been used a long time even though it was not used all of the time. He responded that he knew of nothing wrong with, and in his twenty-four years of experience there had not been any trouble before in, "tying flexible steel pipe to the catline with wraps around it with a chain in order to pick it up." Cochran, an employee of Cactus for sixteen years, was of the opinion that a timber hitch is not used very often.

As the pipe was raised the second time, Williams was standing almost beneath it holding, so he and Simpson said, the power tongs out of the way of the pipe. When the pipe had been raised some twelve to fifteen feet, the tie slipped down the catline and the pipe fell some three or four feet, striking Williams on his right hand. After Williams was struck, the connection held, and the pipe was then raised and connected to the cement head.

Williams was hospitalized for his injuries. Later, almost all of the middle finger of his right hand was amputated.

The verdict of the jury was comprised of its answer to Special Issue No. 1, viz.:

> Do you find from a preponderance of the evidence that an employee for Cactus Drilling failed to properly connect the pipe in question?
>
> Answer "Yes" or "No"
>
> ANSWER: Yes

together with its findings that such failure was negligence and a proximate cause of the occurrence, that Williams was not contributorily negligent in the respects inquired about, and that $30,000 would fairly and reasonably compensate Williams for his injuries. The motion for judgment filed by Cactus was overruled, a new trial was de-

nied, and judgment in favor of Williams was entered on the verdict.[1]

Defendant Cactus presents various attacks on the composition and submission of special issue no. 1 and the jury's answer made thereto, as well as its contention that the answer entitled it to judgment pursuant to its motion. One of the attacks developed is that the issue assumes that an employee of Cactus made the second connection, which was highly controverted, and another is that the jury's answer of "yes" to the issue as worded is ambiguous and will not support a judgment.

To recover on his cause of action developed for submission to the jury, Williams had to initially establish that an employee of Cactus connected the catline to the pipe improperly. Cactus denied that the connection was made by its employee and strove to show that, in any event, the connection was properly made. Both of these essentials of the cause of action were vigorously presented and strenuously contested.

That a Cactus employee made the second connection was not undisputed nor conclusively established as Williams submits. In the final analysis, so far as Cochran knew no employee of Cactus was present; Bland only presumed that it was an employee of Cactus; and Williams, who had deposed following the accident that he did not know whether the person was an employee of Sherman Power Tongs or Cactus, was the only witness to testify definitely that the person was an employee of Cactus. This testimony of identity, depending mainly on the declarations of an interested party, is not so clear, direct, positive and without contradiction that it establishes the identity

as a matter of law, and the evidence does no more than raise the fact issue. See *Cochran v. Wool Growers Central Storage Co.*, 140 Tex. 184, 166 S.W.2d 904 (1942). Equally unresolved was the question of whether the connection was made improperly.

Thus, a jury resolution of the initial two questions was necessary. Rule 279.[2] Although the 1 September 1973-amended Rule 277 invests the court with discretion to submit separate questions with respect to each element of the case or to submit issues broadly, the rule, consistent with the dictates of Rule 279, reiterates that the controlling issues raised by the pleadings and the evidence shall be submitted.

There being no other special issue speaking to either one or both of the two contested elements, these elements were relegated to the coverage provided by special issue no. 1. To be sufficient, the issue must submit the disputed elements for the jury's resolution. Either an assumption of a disputed fact or a phrasing which produces an ambiguous response is fatal.

◼ As cast, the literal language of the issue assumes, or the issue is phrased to lead the jury to believe that it assumed, that an employee of Cactus made the connection. Consequently, the jury was called upon to answer only the single question of whether he failed to properly connect the pipe. There was then no finding, nor any opportunity for the jury to find, whether it was an employee of Cactus who made the connection. The trial court objection clearly pointed out the vice in the wording of the issue, and the overruling of the objection

---

1. The $30,000 recovery was apportioned $24,731.94 to Williams; $1,668.42 to intervenor Liberty Mutual Insurance Company, the workmen's compensation insurance carrier for Byron-Jackson in New Mexico, where Williams resided, for the compensation benefits it had paid to Williams; and $3,599.64 to intervenor Texas Employers' Insurance Association, the workmen's compensation insurance carrier for Byron-Jack-

son in Texas, where the accident occurred, for the $3,099.64 compensation benefits it had paid to Williams and an attorney's fee of $500.

2. All rules are cited by the number under which they appear in Texas Rules of Civil Procedure.

deprived Cactus of its right to the clear submission of the disputed elements that is assured by Rules 277 and 279. Considering the circumstances of the case and the charge as a whole, the force of the assumption contained in the issue is harmful.

If it be arguable that the issue does not contain the assumption, the alternative view is that the issue was drafted to elicit the jury's determination, from a "yes" or "no" response, whether an employee of Cactus made the connection and, if so, whether he improperly did so. In this context, Williams, of course, had the burden to convince the jury by a preponderance of the evidence that both elements of the issue were true. A "yes" answer was necessary to establish both facts; but if the jury was not convinced by the necessary proof that a Cactus employee made the connection even though the jury was convinced that the connection was improperly made, the only way it could respond to the first element of the issue was by a "yes" answer. A "no" answer could not announce that determination if the issue embraced both elements, because the only legal effect of a negative response to the issue as phrased is that the jury was not convinced by a preponderance of the evidence that a Cactus employee failed to properly connect the pipe, which means he did properly make the connection.

Demonstratively, then, the wording of the issue is not capable of producing the two definitive findings Williams was required to obtain for a recovery. If the issue assumed a controverted fact, there was no finding on that essential element in the case. In the event the issue was intended to submit both contested elements for the jury's determination, the "yes" answer could mean that Williams discharged his burden of proof on both elements or it could mean that he failed to convince the jury by the necessary standard of proof that a Cactus employee made the connection. As such, the language of the issue gives rise to mistake in the meaning of the verdict actu-ally returned, and neither the trial court nor this court is permitted to speculate as to what the jury intended by an ambiguous answer which, because of its ambiguity, cannot constitute a proper basis for a judgment. *Moore v. Moore*, 67 Tex. 293, 3 S.W. 284 (1887); *Northern Texas Traction Co. v. Armour & Co.*, 116 Tex. 176, 288 S.W. 145 (1926). An ambiguous verdict makes it impossible to render a proper judgment. *Wright v. Carey*, 169 S.W.2d 749 (Tex.Civ. App., Eastland 1943, no writ).

The defective submission mandates that the judgment be reversed and the cause be remanded. This action pretermits a discussion of the other aspects of the attacks directed to the special issue since they will not arise in the event of a retrial submission of a proper issue or issues. Furthermore, the action renders moot some of the remaining points of error advanced by Cactus; however, in the event of another trial, there are other matters presented in this appeal which require attention.

Cactus asserts it was entitled to judgment because of either of two propositions. Cactus proposes that there is no evidence that Cactus had a duty to warn or protect Williams from any danger of tying the catline to the pipe, because Williams observed the tie being made and it was open and obvious. It is further proposed that the undisputed evidence established the defense of *volenti non fit injuria* since as a matter of law Williams knew or was charged with knowledge of the danger of the situation. Alternatively, there is advanced the contention that it was error for the court to refuse to submit the issues Cactus offered to establish these defenses. A resolution of each proposition necessitates an additional statement of the relevant evidence.

Williams began working for Byron-Jackson sometime in 1968. His injury was sustained on January 16, 1970. Williams observed the second connection being made and he saw nothing wrong with it. Though he knew these types of connections were

made in the oil fields, he made no objection to the way the connection was being made because, as he said, he "was not familiar with it," and he did not know how to do it. So far as he knew, all of the equipment was in perfectly good working order. He stated that the person who made the connection was opposite him in almost the same position under the hookup and that, as the pipe was being raised, the person did not reflect any fear of what was going on or that something improper had been done. He saw nothing based on his experience that needed to be done to prevent the occurrence.

It was the opinion of Bland, who had worked for Byron-Jackson for five years "(t)his past time," that whether a person who saw the tie would think it was a dangerous situation would depend on the experience the person had. When asked if, Bland agreed that, anybody could see that the catline was not dry and it should be open and obvious to them that it might slip; but it was possible, he said, that the "knot would have held if the catline would have been dry or if he had had a proper size chain." He also answered "Sure," to the question, "Well, anyone that would be standing under that catline would be exposing themselves to this danger of falling which you said was because of the size of the chain and the un-dry catline?" Bland believed that he told Williams to watch the pipe as it went up, but he did not tell him it was a dangerous operation or to get out of the way.

Cochran, who had been drilling for Cactus about eight or ten of his sixteen years with the company, stated that regardless of the procedure going on, a drilling rig is dangerous because "(J)ust anything could happen. They could drop a hammer out of the derrick up there on him or anything and hit him." Cochran said that when he saw Williams with his right hand on the casing as the pipe was going up, he ran "to pull him away from there because anything could happen, you know." However, just by looking at it, he had no idea the pipe was going to fall.

Simpson had been a tool pusher for Cactus for almost five years and he was in charge of the rig. He said that it was standard procedure in the oil fields for persons not to stand under anything that is being lifted into the rig.

■ It was, of course, the burden of Williams to prove the existence and violation of a legal duty 'owed to him by Cactus. *Coleman v. Hudson Gas and Oil Corporation*, 455 S.W.2d 701 (Tex.1970). Cactus, as the occupier of the premises over which it had control, owed a duty of ordinary care to Williams, an invitee, which stayed constant unless it was in some manner removed or discharged. *Scott v. Liebman*, 404 S.W.2d 288 (Tex.1966). If the specific danger was so open and obvious that anyone could plainly see it, then, as a matter of law, Cactus owed Williams no duty to warn him of or to protect him from the danger. But the open and obvious situation occurs only when there is no dispute in the evidence concerning the facts that charge one as a matter of law with knowledge and full appreciation of the danger. *Massman-Johnson v. Gundolf*, 484 S.W.2d 555 (Tex.1972). Whether one *should have known* and *should have appreciated* the danger are proper issues only of contributory negligence. Greenhill, *Assumed Risk*, 20 Sw.L.J. 1, 11 (1966).

The proof here does not show the danger was so patent as to charge Williams as a matter of law with knowledge and appreciation of the danger. In addition, the specific danger that resulted in injury to Williams was not that static condition nor that rigidly circumscribed and easily predictable activity which presents an open and obvious situation in invitee cases, and under the circumstances developed, Cactus owed to Williams, as an invitee on the premises controlled by Cactus, a duty not to injure him

through negligence. *Hernandez v. Heldenfels*, 374 S.W.2d 196 (Tex.1963).

■ This brings us to a consideration of the doctrine of *volenti non fit injuria* as a complete defense to this negligence action. For *volenti* to be applicable, it must appear that Williams, with full knowledge of the nature and extent of the danger involved, placed himself, as the result of an intelligent choice, in the way of the particular risk that the tie would slip and permit the pipe to fall. *Wood v. Kane Boiler Works*, 150 Tex. 191, 238 S.W.2d 172 (1951). As a result, it is not sufficient to show that he had knowledge of some danger; he must have had knowledge of the particular danger that resulted in his injury. *Triangle Motors of Dallas v. Richmond*, 152 Tex. 354, 258 S.W.2d 60 (1953). To possess the required knowledge of the specific danger if he did not actually know of it, Williams must have been in possession of facts from which he may be legally chargeable with knowledge of the danger and appreciation thereof. *Halepeska v. Callihan Interests, Inc.*, 371 S.W.2d 368 (Tex.1963).

Application of these principles makes it apparent from all of the evidence, by which Williams's subjective knowledge and appreciation of the specific danger resulting in his injury must be gauged, that he did not actually know of and appreciate the particular danger which resulted in his injury. Even though he had seen the timber hitch used, he was not familiar with it, he did not know how to do it, and he saw nothing wrong with it or the equipment being used.

■ There remains the question of whether Williams was in possession of facts from which he may be legally charged with knowledge and appreciation of the specific danger. Although it is agreed that there is general danger in working around an oil rig, the only facts bearing on the specific danger of slippage that may be said to be in Williams's possession are those elicited from Bland's testimony wherein he stated, "It's possible . . . this knot would have held if the catline would have been dry or if he had had a proper size chain." Bland did not communicate this knowledge to Williams. There is no evidence that Williams appreciated the significance of danger from either condition; he stated positively that he saw nothing wrong with the way the connection was made and that the equipment was in perfectly good working order. The record is devoid of any evidence that his limited experience either made him aware of or provided him with the opportunity to appreciate the danger posed by either condition. It is not reasonably inferable that his short experience armed him with any facts necessary to appreciate the particular danger. Simpson knew of nothing wrong with the procedure. In his twenty-four years of experience, he had never had any trouble with tying the catline to the pipe with a chain, and this incident was the first problem he had known. Cochran said he did not see anything wrong with the way the tie was done and that, by looking at the pipe being raised, he did not know it was going to fall. Further, he stated that neither he nor Williams had any idea that the pipe was going to fall. Additionally, the demeanor of the person who made the connection did not indicate to Williams any fear that something improper had been done.

The evidence is not such as to legally charge Williams with knowledge and appreciation of the particular danger. At most, the evidence does no more than create a mere surmise or suspicion of the existence of the vital facts requisite to a submission of the defensive issues. Surmise or suspicion, in legal contemplation, is not any evidence. *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898). And there being no evidence of the vital facts, the trial court correctly refused to submit the requested issues. *Ladd v. Knowles*, 505 S.W.2d 662 (Tex.Civ. App., Amarillo 1974, writ ref'd n. r. e.).

Cactus pleaded that any negligence was that of a fellow servant of Williams. Cac-

tus contends the court erred in refusing its special issues tendered to inquire if the connection was made by fellow servants of Williams and whether their actions constituted negligence which was a proximate cause and the sole proximate cause of the accident. Cactus also contends the court erroneously refused its tendered special issues, each after the first conditioned on an affirmative answer to the preceding one, inquiring if Bland was a fellow servant of Williams, knew of the danger, failed to warn Williams, and if the failure was negligence which was a proximate cause and the sole proximate cause of the accident.

In this connection, the case was postured for submission under Williams's pleadings and evidence that he, as an employee of Byron-Jackson, had been negligently injured by an unnamed employee of Cactus as opposed to Cactus's denial that it was, and its evidence that it was not, a Cactus employee who made the second connection, and its position that any negligence was that of a fellow employee of Williams. Logically, then, the fellow servant rule is available to Cactus as a defense if, and only if, the unnamed person who made the second connection was a Cactus employee; otherwise, regardless of the status of the workmen, Cactus had no liability. Consequently, in testing the right of Cactus to the defensive issues, it will be assumed that the unnamed person was an employee of Cactus, who had the burden to adduce evidence raising the issues of the pleaded defense and, in the event such issues were omitted from the court's proposed charge to the jury, to request the submission of the defensive issues tendered in substantially correct wording. Rule 279.

■ The general rule is that a master is not liable in a common-law action to one servant whose injury was proximately caused by the negligence of a fellow servant engaged in the same enterprise. *Sandefur v. Sandefur*, 232 S.W.2d 111 (Tex.Civ.App., Amarillo 1950, writ ref'd). Since

fellow servants are those workers who serve the same master, work under the same control, derive their authority and compensation from the same common source, and engage in the same general business, Houston & T. C. Ry. Co. v. Rider, 62 Tex. 267 (1884), the fellow servant rule is applicable only to those employed by the same master. Restatement, Agency 2d, § 476, Comment a. Consequently, workmen employed by different masters are *prima facie* not fellow servants, *Galveston, H. & S. A. Ry. Co. v. Croskell*, 6 Tex.Civ.App. 160, 25 S.W. 486 (1894, writ ref'd), even when they work side by side on a common project. *Brown v. Sullivan*, 71 Tex. 470, 10 S.W. 288 (1888); Restatement, Agency 2d, § 476.

The development of the evidence shows that Cactus Drilling Company, Byron-Jackson, Inc., and Sherman Power Tongs were, and there is no contention that they were not, independent contractors separately engaged in different enterprises on a common project; i. e., completion of the oil well. Under the general principles, Williams and Bland were fellow servants, but Williams and the employees of Cactus were not fellow servants.

■ Notwithstanding, there are exceptions to the general principle that workmen employed by different masters are not fellow servants. For example, an employee of an independent contractor may become the temporary servant of another independent contractor by submitting himself to the latter's control and direction for a particular task. *Grandstaff v. Mercer*, 214 S.W.2d 133 (Tex.Civ.App., Fort Worth 1948, writ ref'd n. r. e.). For this exception to be applicable, it is not sufficient to show that Williams and the Cactus employees were working side by side; there must be proof that either Williams submitted himself to the control and direction of Cactus, or that the unnamed employee of Cactus submitted himself to the control and direction of Byron-Jackson, in carrying out the task for which Byron-Jackson was specifically en-

gaged. No evidence that either of these two events occurred is contained in the record.

■ Another exception is that the employee of an independent contractor may become a fellow servant of another independent contractor's employees when he volunteers in assisting them in a particular task if he is acting to promote the interests of the assisted contractor rather than to further his own interests or those of his own employer. *Stephens v. Mendenhall*, 287 S.W.2d 259 (Tex.Civ.App., Fort Worth 1956, writ ref'd n. r. e.).

■ Although the cementing operation was under the control of Byron-Jackson, Cactus was in control of the oil well and was awaiting the conclusion of the cementing operation so its crews could complete the well. No one requested a Cactus employee to assist in connecting or to connect the catline to the pipe; the unnamed person was a volunteer. There is no testimony of the exact reason why a Cactus employee would make or assist in making the hookup. Since Williams acknowledged that "everyone works together to try to get the job done," it may be that the Cactus employee volunteered merely to assist the Byron-Jackson crew in its operation; or, perhaps he volunteered to promote some special interest of his own or those of Cactus in expediting the completion of the well. But absent any evidence of exactly why he acted, the reason for the action is only speculative. In this state of the record, the answer to the vital question of whether he acted to promote the interests of Byron-Jackson or to further his own interests or those of Cactus must rest on mere surmise or suspicion, which is no evidence. *Joske v. Irvine, supra.* As a result, the court correctly refused submission of the first series of issues pertaining to fellow servants of Williams.

Turning to the role of Bland, it is clear that he and Williams were fellow servants. Accepting the testimony in the light most favorable to raise the defensive issues, it may be said that Bland, although he neither made the second hookup nor requested that it be done by a Cactus employee, recognized the danger in the manner the connection was made, but he did not warn Williams. Under these circumstances, Cactus would be entitled to the submission of its defense as it related to the actions of Bland if Bland had a legal duty to warn Williams.

■ Cactus has suggested no authority holding that a fellow servant has a legal duty to warn his co-workers of potential danger arising from a condition he did not affirmatively create. Texas follows the rule that one who did not create a dangerous situation has no duty to warn another of the danger. *Buchanan v. Rose*, 138 Tex. 390, 159 S.W.2d 109 (1942).

Here, the situation was not created by an affirmative act on the part of Bland; instead, another created the danger which Bland observed. So far as the record reveals, Bland was a mere co-worker of Williams exercising no supervisory control over Williams, and our attention has not been directed to any evidence that shows Bland's employment imposed on him an obligation to warn of any potential danger not of his own making. From these circumstances, we cannot say that Bland had a legal duty, albeit he may have been morally bound, to warn Williams of the danger resulting from the manner in which the unnamed person made the connection. Beyond that, no issues were tendered to establish facts from which a duty to warn could be found. For these reasons, the court correctly refused submission of the requested issues as they related to Bland's role as a fellow servant.

■ One final matter should be noticed. The court refused to permit Cactus to show that Williams, when asked during his deposition what he claimed was done wrong, had answered, "(A)ll I know is that it was an accident." We think the testimony was material to a consideration of all the facts,

and that Cactus was entitled to show that Williams had made the statement. See *West Lumber Co. v. Morris & Barnes*, 257 S.W. 592 (Tex.Civ.App., Beaumont 1923, no writ).

The judgment of the trial court is reversed and the cause is remanded.

ELLIS, Chief Justice.

In my opinion, special issue no. 1 assumes that an employee of Cactus made the second connection which was a controverted fact. I, therefore, concur in the result.

## ON MOTIONS FOR REHEARING

Cactus has reiterated its contentions that it was entitled to judgment because Williams failed to obtain the necessary jury finding that an employee of Cactus made the connection. The inferences are that, under Rule 279, Williams waived his right to recovery by not requesting that specific jury issue with the consequence that, under Rule 434, a take-nothing judgment should have been rendered rather than the remand ordered.

■■■ The uncertainty of the inquiry posed by special issue no. 1 dictated that the cause be remanded. If the issue assumed the controverted fact that a Cactus employee made the connection, it was an error precluding proper ascertainment of an essential fact, and the remand resulted in the interest of justice. *London Terrace, Inc. v. McAlister*, 142 Tex. 608, 180 S.W.2d 619 (1944); *Scott v. Liebman*, 404 S.W.2d 288 (Tex.1966). If the issue did not assume the disputed fact, the jury's answer thereto was ambiguous, and the ambiguity required the remand. *Northern Texas Traction Co. v. Armour & Co.*, 116 Tex. 176, 288 S.W. 145 (1926).

In the event of another trial, attention is directed to the Supreme Court's recent decision in *Farley v. M M Cattle Company*, 18 Tex.Sup.Ct.J. 398 (July 9, 1975), restricting the defense of *volenti non fit injuria* or, as generally known, voluntary assumption of risk, in negligence actions.

The motions for rehearing filed by Williams and Cactus are overruled.