Robert VERETTE and Vertex
Corporation, Appellants,

v.

The TRAVELERS INDEMNITY
COMPANY, Appellee.

No. 16679.

Court of Appeals of Texas,
San Antonio.

Dec. 8, 1982.

Rehearing Denied Jan. 10, 1983.

Donald R. Taylor, Schenker, Rosenheim & Schenker, San Antonio, for appellants.

Damon Ball, Groce, Locke & Hebdon, San Antonio, Ralph S. Carrigan and David M. Lacey, Houston, for appellee.

Before KLINGEMAN, CLARK and BAS-KIN, JJ.

## OPINION

BASKIN, Justice.

Upon motion for rehearing, appellants Verette and Vertex complain that we misconstrued the record in regard to our discussion of the point of error number four. Having concluded that the opinion was subject to such criticism, we withdraw our original opinion and substitute this opinion in its stead. We continue to affirm the judgment of the trial court.

This is a suit based upon breach of contract between a general construction contractor and its bonding company. Initially the Vertex Corporation, Robert Verette who owned Vertex, and Bernard Lifshultz brought an action against the Travelers Indemnity Company for damages for breach of contract, fraud, and misrepresentation, but only the breach of contract claim was submitted to the jury. The Travelers Indemnity Company counter-claimed against Vertex under a written indemnity agreement to recover monies expended. The parties before the court will be denominated Vertex or contractor, Verette, and Travelers, Lifshultz having settled his differences with Travelers.

Vertex and Travelers entered into a standard written indemnity agreement on June 5, 1976, whereby Travelers would issue bid bonds, payment bonds, and construction bonds to cover jobs bid on by Vertex. As time went by, Vertex got into financial difficulties and became unable to pay all its obligations for labor and materials so that it could no longer perform all of its outstanding contracts. When Vertex became unable to meet its contractual obligations and it became apparent that Travelers might have to perform under its bonds, Travelers notified Vertex that it could no longer write any new bonds for Vertex's future construction work. This was a matter of severe concern both to Vertex and to Travelers. If Vertex could no longer purchase bonds, then it would no longer be able to carry on its construction business. If Vertex were unable to perform its outstanding construction contracts, Travelers

would be called upon to pay outstanding claims of contractors, subcontractors, and other suppliers of labor and materials, and it would have to finance the completion of any remaining construction.

Vertex and Travelers entered into protracted negotiations to explore the possibility of Travelers continuing to underwrite bonds for Vertex. If successful, this would give Vertex a chance to extricate itself from its financial difficulties and to return to its previously profitable condition. If Vertex were to succeed in obtaining profitable contracts, then Travelers would not only receive fees for such services, but would also avoid having to spend large sums of money to complete major building projects for Vertex.

On June 24, 1977, Vertex and Travelers executed a series of instruments, particularly a Special Agreement, by which they renewed their business relations. To induce Travelers to execute its bonds as surety on behalf of the contractor as principal, Vertex agreed to indemnify and hold harmless Travelers from any and all liability, loss, costs, expense or damage which Travelers might sustain or incur by reason of its execution of such bonds on behalf of Vertex. The parties agreed that the execution of the Special Agreement and the performance of its terms would be to their mutual benefit. Vertex agreed that prior to or simultaneous with the execution of the agreement it would execute and deliver to Travelers its assignment of all monies due or to become due under seven (7) specified construction contracts in Houston, San Antonio and Austin.

All of the proceeds of such assignments and collateral would be received by the Texas State Bank and credited to the Texas State Bank Escrow Account along with all monies that would be received by Vertex representing proceeds of all claims, demands, suits, acts or proceedings arising out of contracts of the contractor; all payments made to the bank on account of the indebtedness of the contractor; the proceeds of any collateral given by the contractor to the bank for such indebtedness and all monies representing the proceeds of any loan negotiated by Vertex to further completion of the contracts. They agreed that Travelers could "from time to time, in its sole discretion and judgment, and as it [saw] fit, and for so long and in such amounts as it [might] determine, but with no obligation to do so, advance funds to Contractor or execute its bonds or guaranty for repayment to any bank or lending institution which [might] lend monies to Contractor in reliance upon such bond or guaranty of Travelers." Funds so advanced by Travelers and the proceeds of any loan guaranteed by Travelers would be deposited in the Texas State Bank Escrow Account.

The Vertex Corporation's special account, an overdraft account, would be established and maintained at the Texas State Bank for the purpose of paying any necessary labor, materials, supplies, and equipment charges, and expenses for the continuing performance of the above mentioned contracts of the contractor bonded by Travelers and for such other purposes as might be authorized by Travelers. The account was also to be used to indemnify and hold harmless Travelers for any advances which may be made by Travelers and any and all liability, loss, cost, expense or damage which might be sustained or incurred by Travelers and any and all indebtedness of contractor to Travelers including but not limited to insurance and bond premiums. Checks for withdrawals from the special account had to be countersigned by a designated representative of Travelers.

Vertex expressly agreed that at any time and without prior notice or consent, Travelers could withdraw all or any part of the entire balance in the Texas State Bank Escrow Account and apply that money so withdrawn for the following purposes: reimbursement of Travelers for the deposit of funds in the Texas State Bank Escrow Account; discharge of any and all obligations of Travelers on account of the execution of any bonds, undertakings, or guaranties on behalf of contractor; any and all obligations of contractor arising out of the execution of the Special Trust Agreement

described *infra.* The contractor expressly agreed that Travelers at its option and in its sole discretion and judgment might refuse or decline to authorize the issuance of any particular check or checks by the contractor against the special account to be established by the bank pursuant to the trust agreement and might refuse or decline to deposit any funds into the Texas State Bank Escrow Account. After the completion and acceptance of all work in the above mentioned contracts and the discharge of all claims for labor, material, supplies, equipment and services furnished in the prosecution of such work and after the discharge of any and all obligations to Travelers, any balance remaining in the special account would be relinquished to Vertex.

The contractor agreed that in the event of any dispute which it might have with owners, subcontractors, laborors, materialmen or others involving the aforementioned bonds and contracts, Travelers would have the sole discretion and option to make a determination whether such dispute should be litigated or compromised and settled, and the contractor expressly and irrevocably agreed to do everything necessary to enable Travelers to exercise such power.

The rights, powers, and remedies of Travelers under the Special Agreement were in addition to any rights, powers or remedies of Travelers under any other agreement to which contractor and Travelers were parties, each to be cumulative. Nothing contained in the agreement or done pursuant thereto would be construed to enlarge any obligation of Travelers. It was agreed that the contractor was obligated to reimburse Travelers for all attorney's fees, engineer's fees, accountant's fees and any other professional fees that Travelers might incur by reason of going on the contract bonds, except for salaries of Travelers' employees. Further, the contractor would not assign receivables of any kind or type to anyone without the express written consent of Travelers except as specifically provided in the agreement.

Because of its importance in the case we quote Paragraph 15 of the Agreement:

Notwithstanding the current financial condition of the Contractor, Travelers agrees to provide required surety bonds on a joint venture basis in reasonable amounts provided the underwriting information supplied and indemnity provided are of the type and quality to justify the extension of surety credit when Travelers normal underwriting standards are applied.

An instrument entitled Special Trust Agreement executed on the 24th day of June 1977, by and between Texas State Bank and the Travelers Indemnity Company specifically set up the manner in which the Bank, Travelers and Vertex would conduct themselves so as to carry out the promises of Vertex and Travelers contained in the Special Agreement.

The Special Agreement was dated June 24, 1977. The financial statement for Vertex dated June 30, 1977, showed a net loss for the year of $282,845.00. Shortly after execution of the Special Agreement, Travelers advanced Vertex funds amounting to $630,000.00. During the next six and one-half months, Travelers advanced an additional $400,000.00 to Vertex. During that period, Travelers issued several bid bonds and two performance and payment bonds on jobs upon which Vertex had been the successful bidder.

Notwithstanding, Vertex continued to get further behind financially. A great deal of negotiations between the parties, sometimes bitter, occurred through the second half of 1977. By December 31, 1977, Vertex's net worth had decreased more than $500,000.00. Finally, in January of 1978, Verette requested surety credit to bid a project, Houston Community College, in excess of $3,000,000.00. Travelers declined and informed Vertex that it would not issue additional bonds until Vertex showed a capability to finish its jobs and to reduce cost overruns. It was this refusal that formed the basis for Vertex's claim that Travelers failed to apply its normal underwriting standards, as the jury found in answer to

Special Issue No. 1.[1] Since Travelers has not challenged that jury finding, we accept it as a fact and turn now to a consideration of appellant's points of error.

By their first point of error, the appellants claim that the trial court erred in refusing plaintiff's requested special issue on common law fraud; and by their second point of error, appellants say that the trial court erred in refusing to submit plaintiff's special issues on fraud under article 21.21 of the Texas Insurance Code. By their third point of error, appellants maintain that the trial court erred in refusing to submit plaintiff's requested special issue on punitive damages. We shall, as appellants have chosen to do, treat these three points of error together.

The test for submitting issues to the jury is the same as that for instructing a verdict. When reasonable men differ as to truth of controlling facts, a jury issue is present. *Najera v. Great Atlantic & Pacific Tea Co.,* 146 Tex. 367, 370, 207 S.W.2d 365, 367 (Tex. 1948); *Gandy v. Southwestern Bell Telephone Co.,* 341 S.W.2d 554, 556 (Tex.Civ. App.—San Antonio 1960, no writ). All controlling issues that are raised by the pleadings and supported by the evidence shall be submitted by the court. Tex.R.Civ.P. 277, 279.

■ Appellants contend that the trial court erred in failing to submit these three requested issues relating to common law fraud, fraud under the Insurance Code, and exemplary damages, because such issues were raised by the evidence and warranted submission to the jury. This necessarily raises a point of no evidence since the trial court must submit all properly requested issues which are raised by the evidence. *Ladd v. Knowles,* 505 S.W.2d 662, 669 (Tex. Civ.App.—Amarillo 1974, writ ref'd n.r.e.).

Failure to do so constitutes reversible error. *Southwestern Bell Telephone Co. v. Thomas,* 554 S.W.2d 672, 674 (Tex.1977). A trial court cannot refuse to submit an issue merely because an affirmative finding regarding that issue would be against the great weight and preponderance of the evidence. *Imperial Insurance Co. v. Ellington,* 498 S.W.2d 368, 375 (Tex.Civ.App.—San Antonio 1973, no writ). The trial court's refusal to submit the fraud issues and the issue on punitive damages was proper, however, if there was no evidence to support those issues. *Ladd v. Knowles, supra; Cactus Drilling Co. v. Williams,* 525 S.W.2d 902, 909 (Tex.Civ.App.—Amarillo 1975, writ ref'd n.r.e.).

■ In examining a no evidence point, we must consider only the evidence and inferences that may be drawn therefrom that are favorable to appellant's issues and disregard all evidence and inferences to the contrary. *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400, 401 (Tex.1981); *Butler v. Hanson,* 455 S.W.2d 942, 944 (Tex. 1970); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). If upon such review we find that there is a complete absence of evidence of probative force to support the finding, or if the evidence which might tend to support the finding must be disregarded because it is incompetent or otherwise legally insufficient, the no evidence point must be sustained.

The gist of appellant's complaint regarding fraud is that Travelers, while promising to provide substantial bonding in the future, never intended to do so and in fact did not do so. Appellants argue Travelers entered into the Special Agreement for the sole purpose of inducing Vertex, to its detriment, to complete unfinished jobs so that Travelers might avoid liability under the bonding obligation.

---

1. The jury found in answer to special issues as follows:

    No. 1—Travelers failed to apply its normal underwriting standards when it refused to extend surety credit on or about January 20, 1978;

    No. 2—The sum of money to fairly and reasonably compensate Vertex Corporation for lost profits, if any, resulting from the refusal of

    bonding by Travelers on January 20, 1978, was $500,000.00;

    No. 3—The total cost of advances by Travelers to Vertex and expenses incurred in good faith by Travelers to complete the projects it bonded for Vertex was $1,045,000.00;

    No. 4—The sum of money that it cost Travelers, in good faith, to complete the Humble School project was $71,000.00.

The necessary elements to support a cause of action for fraud or misrepresentation, when the alleged misrepresentation concerns action to be accomplished in the future are:

1. The defendant made a promise to the plaintiff to perform a particular action in the future;

2. At the time the promise was made the defendant did not intend to perform;

3. The plaintiff relied on such promise;

4. The plaintiff acted upon the promise to its detriment; and

5. Plaintiff suffered damage thereby.

*K.W.S. Manufacturing Co., Inc. v. McMahon,* 565 S.W.2d 368, 370–71 (Tex.Civ.App. —Waco 1978, writ ref'd n.r.e.); *Morgan v. Box,* 449 S.W.2d 499, 504 (Tex.Civ.App.— Dallas 1969, no writ); *Precision Motors v. Cornish,* 413 S.W.2d 752, 756 (Tex.Civ.App. —Dallas 1967, writ ref'd n.r.e.).

■ We have examined the entire lengthy record, and we conclude that appellants failed to produce any evidence to prove a cause of action based upon fraud, either at common law or under the Insurance Code. We find no evidence that at the time the Special Agreement was signed, Travelers did not intend to comply with the terms of that instrument. We find no evidence in the record of any false statements made by Travelers or its agents to induce Vertex to complete various projects for which it had contracted.

We do not reach the question of whether the fraud provisions under the Texas Insurance Code are applicable in this case. While the proof requirements regarding fraud under the Insurance Code are not as stringent as those required to prove common law fraud, there is nonetheless no evidence in this record that any statement was made by Travelers in such a manner as to mislead a reasonably prudent person to a false conclusion of a material fact as is required under the Code. The allegations of fraud are no more than speculation.

Special issues may not be submitted solely on the basis of surmise or conjecture.

*Texas Sling Co. v. Emanuel,* 431 S.W.2d 538, 540 (Tex.1968). Surmise or suspicion, in legal contemplation, is no evidence at all. *Joske v. Irvine,* 91 Tex. 574, 582, 44 S.W. 1059, 1063 (1898). The trial court properly refused to submit appellants' special issues regarding fraud, and we accordingly overrule points of error one and two.

■ Appellants also maintain that they had a right to submit an issue on punitive damages; but that position is based upon their alleged fraud theory. Since appellants were not entitled to a submission of any special issues regarding fraud, the claim for punitive damages is baseless.

■ Vertex alternatively claims that it was entitled to a submission of its punitive damage issue in connection with its breach of contract claims. This court has previously, in *McDonough v. Zamora,* 338 S.W.2d 507, 513 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.), speaking through Judge Pope, stated the rule in such instance:

Punitive damages are not recoverable in actions for breach of ordinary commercial contracts, though the breach is brought about capriciously and with malice.

Assuming *arguendo* that appellant is correct in its claim for breach of contract, still it is not entitled to receive punitive damages and hence not entitled to inquire of a jury regarding punitive damages.

■ Finally, even if it were to be assumed that Vertex was entitled to an issue regarding fraud, it would still not be entitled to a submission on punitive damages. In order to recover for punitive damages in a fraud case, appellants must have shown that they suffered actual damages as a result of a fraud intentionally committed for the purpose of injuring Vertex. The conduct by Travelers would have to rise to the level of wanton, deliberate and malicious activity before punitive damages could be awarded. *See Dennis v. Dial Finance & Thrift Co.,* 401 S.W.2d 803, 805 (Tex.1966); *Ware v. Paxton,* 359 S.W.2d 897, 899 (Tex.1962). There is no evidence in the record of any willfull, wanton or malicious action taken by Travelers for the pur-

pose of injuring Vertex, the final decision to cease bonding being a business decision dictated by the financial difficulties in which Vertex found itself.

Since appellants have failed to prove a cause of action under fraud or other tortious action and have failed to show themselves entitled to punitive damages for breach of contract, we hold that the trial court correctly declined to submit an issue on punitive damages. Appellants' third point of error is overruled.

■ Appellants' fourth point of error is that the trial court erred in refusing to submit a defensive issue relating to interference with performance of a contract. That is, appellants take the position that the trial court should have submitted this special issue in defense to the counterclaims made by Travelers. Vertex's argument is circular and untenable. The jury found that Travelers' failure to issue additional surety credit resulted in $500,000.00 damage to Vertex. The trial court, in offsetting that amount of damage from the sums which Vertex owed Travelers, gave Vertex and Verette the full benefit of any damage to them wrought by Travelers. We find no pleading in the record in answer to Travelers' counterclaim in which appellant pleaded such an affirmative defense, nor do we find any prayer requesting relief on this defensive issue. The trial court did not err in refusing to submit to the jury plaintiff's "defensive" issue relating to interference with performance of the contract, and in any event, we cannot say that the action of the trial court, even if erroneous, was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Tex.R.Civ.P. 434. We overrule point of error four.

■ The fifth point of error raised by Vertex attacks the trial court's failure to submit its requested special issue on attorney's fees. Verette did not request attorney's fees. In putting on its case for attorney's fees, Vertex failed to allocate attorney's time and fees between the attorney's work for Vertex and for Verette; in addition the issues submitted by Vertex failed

to inquire of the jury regarding allocation among those parties to the litigation and among the various causes of action and defenses in the litigation. *See Bray v. Curtis,* 544 S.W.2d 816, 819–820 (Tex.Civ.App. —Corpus Christi 1976, writ ref'd n.r.e.); *American National Bank & Trust Co. v. First Wisconsin Mortgage Trust,* 577 S.W.2d 312, 320 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.); *Stone v. Lawyers Title Insurance Corp.,* 537 S.W.2d 55, 64 (Tex.Civ.App.—Corpus Christi 1976), *rev'd in part on other grounds,* 554 S.W.2d 183 (Tex.1977).

For the foregoing reasons Vertex wholly failed to show itself entitled to recover attorney's fees in any specific amount, and the trial court appropriately declined to present the special issues regarding attorney's fees to the jury. Appellants' point of error five is overruled.

■ Appellant's sixth and final point of error is that the trial court erred in granting a new trial after "the first jury verdict" without giving any notice, holding a hearing thereon, or stating any reasons therefore. Following return of a verdict by the jury in a previous trial, the trial judge, who was not the trial judge from which the instant appeal is being prosecuted, upon his own motion and without hearing, entered an order granting a new trial. Appellants apparently did not attempt to appeal that action of the first trial judge nor attempt to mandamus him to enter some other form of order or judgment nor do anything else at that time. Any right which appellants may have had at that time has been waived by their failure to prosecute any appeal from such orders. *See Anderson v. Blalock,* 272 S.W.2d 741 (Tex.Civ.App.—San Antonio 1954, no writ). Appellants' attempt to raise objection to a post-verdict ruling in a trial that is not involved in this appeal is frivolous, and appellants' sixth point of error is overruled.

Travelers has brought three cross-points of error, each of them dealing with the jury's findings of damages for lost profits resulting from the refusal of bonding by

Travelers. In answer to Special Issue No. 2, the jury found that Vertex had lost profits of $500,000.00. Travelers says that this answer cannot stand because there was no competent evidence to support the answer, claiming that the evidence concerning lost profits was too remote in time; that Vertex had no overall history of profits; that the testimony of Vertex's expert witness was based on assumptions that had no factual proof in the record; and that Vertex suffered no lost profits. We shall treat the three cross-points together, keeping in mind that when deciding a "no evidence" point "we consider only that evidence and reasonable inferences therefrom which viewed in its most favorable light supports the jury finding and we must reject all evidence or reasonable inferences to the contrary." *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400, 401 (Tex.1981) (per curiam).

For the question of remoteness and profit history, Travelers cites us to three cases, declaring that the basic statement of Texas law on the recovery of lost profits is found in *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938), in which the Supreme Court discussed the rules of evidence to prove lost profits, quoting from 13 TEX.JUR. 215, § 144: " 'Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost.' "

The very next sentences, which Travelers did not quote, were:

'It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business for the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions.'

In the early decisions a rigid rule affecting the right of recovery for lost profits was announced. Modern business methods have caused a relaxation of that hard rule.

Travelers next cites us to this court's opinion in *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180 (Tex.Civ.App. —San Antonio 1964, writ ref'd n.r.e.) for essentially the same rule found in *Southwest Battery Corp.* The holding, however, was that Atomic failed to show that it was an established business. The new venture into uranium and vanadium milling was admittedly a speculative one, and Atomic had never milled a ton of either metal. This is wholly unlike the case at bar which deals with the common building industry and with a company which had been in that business for several years.

The last case cited by Travelers under this argument is *Berne v. Keith*, 361 S.W.2d 592 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.), again for the rule that the profit history upon which lost profits are recovered must not be too remote from the time of the breach of contract or tortious conduct for which lost profits are sought as damages.

■ We do not disagree with the generalized rules cited to us by Travelers, but we do not agree that the trial court below breached them. In *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955) the Supreme Court upheld an award of damages for lost profits. On January 19, 1953, Jackson, who had been an officer, director, and stockholder in Pace Corporation, was taken out of the corporation. As part of the consideration for the take-out, Pace agreed not to do business in Bandera and Kerr Counties and to sell Jackson cigarettes at a special discount. Jackson opened in Kerrville a cigarette vending machine business on March 13, 1953, and a wholesale cigarette business on May 1, 1953. On May 10, he entered his first order of cigarettes from Pace Corporation, and it was filled. On May 20, he entered a second order, and Pace declined to fill it. Jackson sued in anticipatory breach of Pace's agreement described above. Pace took the position that Jackson could not recover for loss of profits

because his business was new and unestablished and because the amount of profits could only be conjectural. The Supreme Court allowed Jackson to recover, saying that he had a business at the time the breach of contract occurred and that there is always some conjecture in the calculations of lost expected profits. *See also Bell Helicopter Co. v. Bradshaw,* 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, no writ), in which damages for lost profits were sustained. We hold that Vertex had been in business long enough to be established and was in active business at the time of the breach of contract. The jury's answer to Special Issue No. 2 will not be reversed on that ground.

In addition to Verette, two expert witnesses, an accountant and an economist, testified for Vertex with regard to lost profits. The experts used the annual financial statements of Vertex for the fiscal years 1973, 1974, 1975, and 1976, the fiscal year ending June 30. They did not use the annual financial statement dated June 30, 1977, nor any of the financial date for the rest of the calendar year of 1977. They justified this as good economic and accounting practice in projecting the financial future of Vertex, including lost profits, because of aberrations in the company's financial condition during that period. They were particularly concerned with a fire which occurred September 9, 1976, which "hung" an account receivable of $120,000.00 for about eleven months. The experts so rendered their opinion, and we are not prepared to find that their professional opinion was without justification. We hold that the evidence from which the expert witnesses projected lost profits was not so remote as to render it incompetent to support the jury's finding.

The theory of Donald D. Funk, the accountant, was that but for Travelers' refusal to write additional bonds in January of 1978, Vertex would have continued to grow as it had in fiscal years 1973–1976. This would include getting more and larger jobs, making greater profits, and obtaining sufficient capitalization. Travelers asserts that

Funk had no basis for such assumptions. Funk's opinion was that Vertex had suffered and would suffer lost profits ranging from $7,076,216.54 to $14,764,288.84 in the ensuing ten years. It is apparent that the jury did not accept Funk's optimistic opinions, as it found the lost profits of Vertex based upon Travelers' breach of contract to be $500,000.00. Given the history of Vertex and the professional assurances of Funk and of Benz, the economist, that it was appropriate to ignore the fiscal year of 1977 in determining the financial future of Vertex, we cannot say that there was no competent evidence for the jury to reach its conclusion. Travelers' contention does not withstand close examination of the record since there was other evidence and other opinions from which the jury could reasonably have reached its conclusion. "It is the function of the jury to pass on the weight of the evidence and the credibility of the witnesses and where there is conflicting evidence, the jury verdict on such matters is generally regarded as conclusive." *Tejas Gas Corp. v. Magers,* 619 S.W.2d 285, 288 (Tex.Civ.App.—Texarkana 1981, writ ref'd n.r.e.).

Travelers says that Funk's opinion as to lost profits was essential to the jury's answer to Special Issue No. 2. We disagree. The projections of Funk were for ten years. At $7,076,216.54 per ten years, on a straight line basis, they would have amounted to $707,621.65 per year, and at $14,764,288.84 they would have amounted to $1,476,429.00 per year. The jury found damages from lost profits of $500,000.00. If the same type calculation were done as in the previous sentence, the lost profits would have amounted to $50,000.00 per year. Vertex had done better than that prior to its relations with Travelers.

We might not have reached the same answer to Special Issue No. 2 if we had been jurors, but we cannot substitute our judgment for that of the jury if the findings are based upon competent evidence. *Alford, Meroney & Co. v. Rowe,* 619 S.W.2d

210, 213 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.). We overrule all three cross-points advanced by Travelers.

The judgment of the trial court is in all things affirmed, and the motion for rehearing filed by appellants and that filed by Travelers are denied.

KLINGEMAN, J., not participating.