**SOUTHWESTERN BELL MEDIA, INC., Appellant,**

v.

**Vernon P. LYLES, Appellee.**

**No. 01–90–00848–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 6, 1992.

Rehearing Denied March 19, 1992.

Wells & Associates, P.C., D. Brent Wells, Deborah Heaton McElvaney, Houston, for appellant.

James G. Kinser, Michael P. Kovich, Kevin Dubose, Houston, for appellee.

Before TREVATHAN, C.J., and DUGGAN and O'CONNOR, JJ.

## OPINION

DUGGAN, Justice.

Southwestern Bell Media, Inc., sued Vernon Lyles, owner of Freedom Bail Bonding Company, seeking to collect balances allegedly due on advertising purchased by Lyles in the 1986 and 1987 Yellow Pages. Lyles counterclaimed asserting that Southwestern Bell had breached its contracts with him and had violated the Deceptive Trade Practices–Consumer Act (DTPA)[1] by accepting money intended as payment for new advertising, applying that money to a disputed account for old advertising, misrepresenting its application of the money, and excluding his advertisements from the 1988 Yellow Pages.

On May 25, 1990, after a bench trial, the court signed a judgment, supported by findings of fact and conclusions of law, granting relief to both parties. The judge awarded damages to Southwestern Bell on its collection suit that, after a credit to Lyles for breach of contract, amounted to $21,000. The court also entered judgment in favor of Lyles for $100,000 on his DTPA counterclaim. The judge awarded $20,000 in attorney's fees to Southwestern Bell and $25,000 in attorney's fees to Lyles and provided for a scaled award of attorney's fees on appeal. After offsetting the awards, the court ordered Southwestern Bell to pay Lyles $78,395.91. We affirm.

Southwestern Bell raises eight points of error. In points one through four it contends that the trial court erred in failing to hold that Lyles' counterclaim was barred by the applicable statute of limitations. In point five, Southwestern Bell questions both the legal and factual sufficiency of the evidence to support the court's finding that Southwestern Bell's alleged misrepresentation was the producing cause of Lyles' damages. Points six and seven challenge the trial court's award of DTPA damages and the admission of Lyles' expert testimony on the damage issue. In point eight, Southwestern Bell claims error in the court's award of attorney's fees.

Southwestern Bell's suit against Lyles, filed in July 1988, was grounded in its claim that Lyles had breached two agreements for directory advertising in the 1986 and 1987 Yellow Pages by failing to pay for the ads. Alternatively, Southwestern Bell sought $59,830.59 in damages, including the balance on the accounts, interest, costs, and attorney's fees on the basis of quantum meruit.

In April 1990, Lyles amended his general denial to add a counterclaim, the basis for which was two-fold: (1) breach of contract, negligence, and/or fraud arising from

---

1. TEX.BUS. & COM.CODE ANN. § 17.41 et seq. (Vernon 1987).

Southwestern Bell's failure to provide advertising services as agreed in the 1986 and 1987 Yellow Pages, and (2) violations of the DTPA arising from Southwestern Bell's several alleged misrepresentations to Lyles, particularly its misrepresentation in obtaining a $5,000 deposit ostensibly for directory advertising for the 1988 Yellow Pages, applying that deposit to the balance on Lyles' 1986 and 1987 accounts, and excluding his advertisement from the 1988 directory. Lyles also sought mental anguish damages and exemplary damages. Southwestern Bell asserted the two year statute of limitations as a bar to the DTPA counterclaim. The act provides as follows in relevant part:

Section 17.565.

All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.

TEX.BUS. & COM.CODE ANN. § 17.565 (Vernon Supp.1991).

All parties agreed that the alleged misrepresentations, if any, were made on December 9, 1987, the date Lyles tendered and Southwestern Bell accepted the $5,000 check. Lyles' counterclaim was filed some 28 months after that date, on April 16, 1990. However, applying the discovery rule, the trial court found that the counterclaim was not barred by limitations. Specifically, the trial court found the following facts:

(1) On December 9, 1987, Southwestern Bell made a series of misrepresentations to Lyles concerning the status of his existing account and his ability to obtain future advertising in the 1988 Yellow Pages;

(2) Given the nature of the misrepresentations and the long-standing commercial relationship between Southwestern Bell and Lyles, the misrepresentations amounted to false, misleading, and deceptive trade practices actionable under the DTPA; and

(3) Lyles could not reasonably have discovered these deceptive trade practices prior to May 8, 1988, which, therefore, was the date limitations began to run on his counterclaim.

The court concluded that the counterclaim was timely filed.

Southwestern Bell contends the trial court erred as a matter of law in this holding. Specifically, Southwestern Bell claims there is no evidence to support the trial court's failure to apply the two-year statute of limitations; that the evidence conclusively established the application of limitations; and that the evidence is legally and factually insufficient to support the application of the discovery rule.

■ The discovery rule is a plea in confession and avoidance. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988). In other words, assertion of the rule does not involve a claim that the suit is not barred by the statute of limitations. Instead, the plaintiff who pleads the discovery rule effectively admits that limitations would apply except for some circumstance, his inability to discover the misrepresentation sooner than he did, which justifies the court in tolling the statute of limitations. *Woods*, 769 S.W.2d at 517; *Willis v. Maverick*, 760 S.W.2d 642, 644–45 (Tex.1988).

■ The discovery rule provides that the statute of limitations runs from the date the plaintiff discovered or, in the exercise of reasonable diligence, should have discovered the nature of the injury suffered. *Willis*, 760 S.W.2d at 646. Under the DTPA, the statute of limitations begins to run when the deceptive act or practice occurs or, if the deception is concealed, when the plaintiff, in the exercise of reasonable diligence, should have discovered the occurrence of the misrepresentation made the basis of the complaint. *Woods*, 769 S.W.2d at 517; *Black v. Wills*, 758 S.W.2d 809, 816 (Tex.App.—Dallas 1988, no writ). The rule imposes a duty on the plaintiff to exercise reasonable diligence to discover the facts of the negligence or

omission. *Willis,* 760 S.W.2d at 646. The date the plaintiff discovered or should have discovered the misrepresentation is a question of fact. *Willis,* 760 S.W.2d at 647; *Black,* 758 S.W.2d at 816.[2]

We agree with appellant that, but for the trial court's application of the discovery rule, Lyles' counterclaim would have been barred by the statute of limitations as a matter of law. A simple mathematical calculation conclusively establishes the expiration of the statutorily mandated two-year limitations period to be December 9, 1989.

■ Therefore, the propriety of the court's application of the discovery rule is the threshold issue before us. If the discovery rule was properly applied, then the court's failure to hold the claim was time barred was also proper. If, on the other hand, as Southwestern Bell contends, there was no evidence or insufficient evidence to support the application of the discovery rule, the court's failure to apply the statute of limitations would be error. Accordingly, we consider the legal and factual sufficiency of the evidence to support the trial court's finding that Lyles reasonably could not have discovered the misrepresentations before May 8, 1988.

■ The standard of appellate review applied to a trial court's findings of fact is the same as that applied to a jury's verdict. *See Brown v. Frontier Theatres, Inc.,* 369 S.W.2d 299, 301 (Tex.1963); *Valencia v. Garza,* 765 S.W.2d 893, 896 (Tex.App.—San Antonio 1989, no writ). A no evidence challenge requires us to review only the evidence and reasonable inferences from the evidence that tend to support the finding, disregarding all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Brown,* 369 S.W.2d at 301; *Zieben v. Platt,* 786 S.W.2d 797, 799 (Tex.App.—Houston

[14th Dist.] 1990, no writ). If there is any evidence of probative force in support of the finding, the no evidence challenge must be overruled. *Zieben,* 786 S.W.2d at 799. A challenge to the factual sufficiency of the evidence requires us to consider evidence both in support of and contrary to the challenged finding. We may set aside the finding only if the evidence so is weak or the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *Zieben,* 786 S.W.2d at 799.

■ Furthermore, in a bench trial, the trial court, as fact-finder, is the sole judge of the credibility of the witnesses. He may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Valencia,* 765 S.W.2d at 895; *Electro–Hydraulics Corp. v. Special Equip. Eng'rs, Inc.,* 411 S.W.2d 382, 386–87 (Tex.Civ.App.—Waco 1967, writ ref'd n.r.e.).

Lyles testified that he did not realize that his advertisement was being excluded from the 1988 directory until May 7 or 8, 1988, when he was told that the book was closed and his ad was not included. Thus, the trial court had to decide whether Lyles, in the exercise of reasonable diligence, should have known about his exclusion prior to that date.

Lyles testified that on December 9, 1987, he met with two sales representatives of Southwestern Bell for the purposes of resolving the continuing problems he had had with past Yellow Pages advertising and assuring his place in the 1988 directory. Jim Merrell, a long time business associate and advisor of Lyles who attended that meeting as an observer, testified that Lyles

---

**2.** Successful assertion of the discovery rule does not depend upon the plaintiff's use of any magic words or phrases in his or her testimony. *See Kelley v. Rinkle,* 532 S.W.2d 947, 948 (Tex.1976) (plaintiff testified that he had "no knowledge" until August of one creditor's filing of an unfavorable credit report against him, even though he had received notice the previous April and May that his applications for credit with several

businesses had been rejected on the basis of unfavorable information received from Credit Bureau Services); *see also Willis,* 760 S.W.2d at 643 (plaintiff "believed" a partition suit was prohibited under the agreement); *Black,* 758 S.W.2d at 814–15 (the burden placed on a defendant by application of the discovery rule is less onerous than the injustice of denying relief to "unknowing" victims).

was pleased to be meeting with someone who had the authority to address his complaints. After the meeting, Merrell expected that Lyles' complaints about past mistakes in his ad copy and the credits he sought for charges for those ads would be resolved. Merrell expressly understood Lyles' $5,000 payment to be a deposit on the 1988 book. Prior to the meeting, he and Lyles had discussed Lyles' hope of resolving the past problems and his intention to make a $5,000 deposit for the 1988 book.

Eric Bechner, sales representative for Southwestern Bell Yellow Pages, testified that he first contacted Lyles when he was given his account to handle for the 1988 Yellow Pages. He considered Lyles a major advertiser. It was his job to sign people up for advertising. Bechner took with him to the meeting a contract indicating Lyles' current Yellow Pages ads and a copy of his 1987 ad. Although Bechner testified that he also went to see Lyles' about collection, he stated that, prior to the meeting, he obtained no information from the billing department in regard to Lyles' delinquent account. While Bechner testified that Lyles' owed "around $20,000 or $30,000," Southwestern Bell's records indicated the balance on the account to be $65,584.24. Bechner also stated that he was unaware of Lyles' dissatisfaction with his previous ads until Lyles expressed his complaints at the December 9 meeting, but agreed to investigate them and get back in touch with him after the first of the year. However, Bechner never contacted Lyles again.

Bechner also stated that he told Lyles that he was there to keep Lyles' account from being accelerated. He was unaware the account had already been accelerated until a week or so after the meeting.

Joe Robinson, sales manager for Southwestern Bell, testified that he has a crew of representatives who contact people for the selling of Yellow Page advertising. In December 1987, Eric Bechner was one of his sales reps. He accompanied Bechner to the December 9 meeting. The number one reason for that meeting was Lyles' 1988 Yellow Pages ad. The second reason was that Lyles' account was falling behind, in serious shape on past due amounts. Robinson reversed the order of these priorities in later testimony. Robinson did not recall Merrell's presence at the meeting.

Robinson responded to Lyles' complaints about past errors in his ads by stating that Lyles would be entitled to an adjustment in his billing. However, he did not negotiate the adjustment at that time. Instead, he agreed to investigate the problem and contact Lyles after the first of the year. Robinson testified that when he told Lyles his account was possibly going to be accelerated, Lyles' offered to pay $5,000 on the past due account. Like Bechner, Robinson incorrectly remembered the amount of delinquency to be "around $28,000." When Robinson learned later that day or the next that the account actually had been accelerated, he did not contact Lyles because he "wasn't too concerned about it" at that time.

Southwestern Bell also contends that, on the strength of its written communications to Lyles, he knew or should have known of the misrepresentations long before May 8, 1988. In support of its contention, Southwestern Bell points to an invoice dated January 4, that indicated Lyles' $5000 payment had been applied to his past due balance; an advertising form indicating the ad had been "zeroed out;" and two form collection letters, dated February 4[3] and March 1, stating that Lyles' account was seriously delinquent and his future advertising privileges had been cancelled.

Lyles testified that Bechner and Robinson assured him that they would investigate his complaints, and he would be issued credits and adjustments on his outstanding balance. Those same representatives instructed him to disregard and not to worry

---

**3.** Lyles' address is written by hand onto the February 4 form letter. However, the form is not entirely filled out and omits the salutation so as to read only "Dear _____" It is signed in a different handwriting by Bechner, the same representative who, according to Lyles, had, in person, told Lyles to disregard the billing statements he would continue to receive. (See exhibits.)

about the computer generated billing that he would be getting on his account. They also assured him that he would have no problem getting his advertisement into the 1988 Yellow Pages directory. The receipt Southwestern Bell issued to Lyles for his $5000 check was filled out by hand to indicate that payment was received for the "directory of appearance" described as the "Houston" directory with a "publication date" of "9/88." However, the receipt also contained a check mark in a box labelled "past due payment." Lyles argues that this ambiguity created a fact issue for the court, as fact finder, to resolve.

Lyles also testified that on December 11, 1987, he hired a consultant, Paul Combes, to do the art work for his 1988 advertisement and to conduct further negotiations with Southwestern Bell on his behalf. Combes informed Southwestern Bell that he would be handling the art work for the 1988 book. Combes testified that Southwestern Bell representatives assured him Lyles could bring the prior account current and that his ad would be placed in the 1988 directory.

In January of 1988, Southwestern Bell offered Combes a $2000 adjustment on Lyles' outstanding account balance and again, in February 1988, Southwestern Bell offered a 7.5 percent adjustment to Lyles through Combes. At that meeting, believing that they were making progress in the negotiations, Combes gave the advertising copy for the 1988 book to the Southwestern Bell representative. The representative did not refuse the copy.

As late as April 1988, Southwestern Bell offered a 20 percent adjustment on Lyles' past due account. Lyles rejected the offer by letter dated April 20. Southwestern Bell, by return letter dated May 5, 1988, stated that the 20 percent adjustment was its final offer and that Lyles' continued rejection would indicate an impasse in negotiations. Upon receipt of that letter, Combes called Southwestern Bell's representative and was told for the first time that the entries for the 1988 Yellow Pages had been sealed and Lyles had been locked out of the book. It was only when Combes

called him with this information that Lyles realized that his advertisement would be excluded from the 1988 directory.

After hearing all the evidence, the trial court determined that Lyles could not reasonably have discovered the misrepresentations by Southwestern Bell before May 8, 1988.

■ A trial court's findings of fact have the same force and dignity as a jury verdict and, when supported by some competent evidence, will not be disturbed on appeal. *Spiller v. Woodard*, 809 S.W.2d 624, 627 (Tex.App.—Houston [1st Dist.] 1991, no writ); *Paul v. Johnson*, 314 S.W.2d 338, 345 (Tex.Civ.App.—Houston 1958, writ dism'd). The trial judge, as the trier of fact, may draw reasonable inferences from the evidence, and his findings of fact, when supported by some evidence of probative value, may not be disregarded on appeal unless they are so contrary to the overwhelming weight of the evidence as to be manifestly wrong. *Ray v. Farmers' State Bank*, 576 S.W.2d 607, 609 (Tex. 1979); *Pizzitola v. Galveston County Central Appraisal Dist.*, 808 S.W.2d 244, 247 (Tex.App.—Houston [1st Dist.] 1991, no writ); *IFG Leasing Co. v. Ellis*, 748 S.W.2d 564, 565–66 (Tex.App.—Houston [14th Dist.] 1988, no writ). The trial court's finding is supported by sufficient evidence and will not be disturbed on appeal.

Based upon its finding, the trial court properly applied the discovery rule to toll the running of the statute of limitations on Lyles' counterclaim until May 8, 1988. The counterclaim, filed April 6, 1990, was, therefore, timely. We overrule appellant's first four points of error.

■ In its fifth, sixth, and seventh points of error, Southwestern Bell complains of the trial court's award of DTPA damages to Lyles in the amount of $100,000. Southwestern Bell contends that the evidence is legally and factually insufficient to prove a "producing cause nexus" between its alleged misrepresentations and Lyles' damages (point five); that the court erred in admitting Lyles' "expert" testimony on the amount of his damages (point six); and that when Lyles' testimony is

properly excluded, there is no expert opinion to establish the amount of future profits claimed by Lyles (point seven).

■ In order to recover damages under the DTPA, Lyles had the burden to prove that Southwestern Bell committed false, misleading, or deceptive acts which were a *producing cause* of actual damages to him. *MacDonald v. Texaco, Inc.*, 713 S.W.2d 203, 205 (Tex.App.—Corpus Christi 1986, no writ); TEX.BUS. & COM.CODE ANN. § 17.46 (Vernon 1987). Producing cause is "an efficient, exciting, or contributing cause, which in a natural sequence, produces the injuries or damages complained of." *Rourke v. Garza*, 530 S.W.2d 794, 801 (Tex.1975).

Southwestern Bell bases its challenge on the contention that Lyles had in his possession, at the time the misrepresentations were made, documentary proof demonstrating that the alleged representations by the company's representatives were not true. Specifically, Southwestern Bell refers to two computer-generated directory advertising invoices received by Lyles in October and December 1987, stating that his account had been accelerated and his credit and advertising privileges had been rescinded.[4] In addition, Southwestern Bell claims that the receipt for Lyles' $5,000 payment put him on notice that the money was being applied to his past due account, not to a reservation of space in the 1988 book. Southwestern Bell reasons that Lyles' alleged knowledge of these facts "intervened and superseded any misrepresentation."

In its analysis of the information available to Lyles at the time of the misrepresentations, however, Southwestern Bell does not acknowledge the other informa-

tion that it was simultaneously furnishing to Lyles both directly and, later, through his agent Combes. As recounted above, Lyles and Combes both testified that Southwestern Bell continually assured them that adjustments would be made and credits given on the account. Lyles testified that Southwestern Bell had acknowledged all along that some adjustment in his balance was appropriate because of the errors in the 1986 and 1987 directory advertisements. During the December 9, 1987, meeting the company's representatives told Lyles that they were there "to keep [the account] from being accelerated" and instructed him to disregard the billing notices that would continue to be mailed to him.

■ Southwestern Bell also contends that there can be no producing cause nexus because Lyles' testimony regarding the amount of his lost profits resulting from the exclusion of his 1988 Yellow Pages advertisement was merely "perfunctory, speculative, and conclusory." In order to recover lost profits, a party must produce sufficient evidence to enable the fact finder to determine the net amount of the loss with reasonable certainty. *Maxvill–Glasco Drilling Co., Inc. v. Royal Oil and Gas Corp.*, 800 S.W.2d 384, 386 (Tex. App.—Corpus Christi 1990, writ denied); *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 258 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.); *Popkowsi v. Gramza*, 671 S.W.2d 915, 918 (Tex.App.—Houston [1st Dist.] 1984, no writ). It is not necessary that the lost profits be subject to exact calculation. *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex. 1983).

■ In order to recover lost profits, a party must show either a history of prof-

---

**4.** Appellant does not state the substance of the alleged misrepresentations it refers to, but we presume them to include the representation that the $5,000 payment was collected from Lyles to reserve a place for his ad in the 1988 directory. Appellant apparently concludes that the invoices were sufficient to put Lyles on notice that Southwestern Bell was invoking its policy to require full payment in advance for future advertising when past due balances are not paid. ("Your credit and advertising privileges have been rescinded.") In oral argument, Southwest-

ern Bell stated that Lyles should have known the $5,000 payment could not possibly have served as a deposit on space in the 1988 book because he had already received the invoices stating that his account had been accelerated. It is Southwestern Bell's position that Lyles had superior knowledge to that of its own representatives who were present at the December meeting, in person, assuring Lyles that acceleration had not occurred. According to Southwestern Bell, Lyles should have disregarded their assurances.

itability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty. *Allied Bank West Loop v. C.B.D. & Assoc.*, 728 S.W.2d 49, 54–55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938). While the fact finder may not rely solely on the subjective opinion of an interested party, Texas cases permit recovery for lost profits in reliance upon routinely kept business records—that is, upon an evaluation of a business's decreased profitability based upon objective facts, figures, and data. *Allied Bank West Loop*, 728 S.W.2d at 55; *Automark of Texas v. Discount Trophies*, 681 S.W.2d 828, 830 (Tex.App.—Dallas 1984, no writ).

The *Automark* case illustrates application of this rule. Discount Trophies sued Automark for lost profits when a special typewriter manufactured by Automark and used by Discount Trophies for personalizing trophies malfunctioned, allegedly costing Discount Trophies to lose a significant amount of convention business. O'Dell, the owner of Discount Trophies, testified both as the business owner and as a business expert. The Dallas court specifically pointed out that O'Dell's *expert* testimony concerned only his loss of sales income rather than his loss of net profits. Therefore, the only testimony on lost profits came from O'Dell, the non-expert business owner.

The court reviewed the non-expert testimony concerning O'Dell's claim for lost profits and determined the following:

All of O'Dell's non-expert testimony concerning damages was given from personal and unaided recollection. Despite a timely request by Automark for O'Dell's pertinent business records and despite an admission by O'Dell that such records were available, O'Dell appeared at trial with no objective business data other than a hand-prepared summary itemizing potential engraving sales losses, which

summary the trial judge ruled to be inadmissible. . . . O'Dell was able nonetheless to recollect approximately: (1) the number of participants at 16 dance conventions while he was without the use of the trophy typewriter, (2) the engraving sales actually made at these conventions, and (3) the engraving sales at similar conventions held the previous year. . . . We find this subjective testimony of O'Dell, standing alone, legally insufficient to support an award of consequential damages for lost profits.

To be recoverable, lost profits must be proved with "reasonable certainty." Controlling as to proper disposition of this appeal is the complete absence from the record of objective facts, figures, and data without which . . . it cannot be ascertained with the required degree of certainty that O'Dell's trophy engraving operation . . . would have continued to be profitable had the trophy typewriter not failed to function. Two critical determinants are missing: (1) nowhere in the record is there objective documentation that prior to the typewriter's malfunctioning [the business] had an established track record of profitability and (2) nowhere in the record is there objective documentation that . . . a net profit would have been obtained had the typewriter not malfunctioned.[5] As a consequence, it is not possible from the record to make a meaningful correlation between the business's loss of profitability attributable to the nonoperational typewriter.

681 S.W.2d at 830 (citations omitted).

Based upon this analysis of the evidence in the record before it, the Dallas court reformed the trial court's judgment to delete the award for lost profits. 681 S.W.2d at 831.

In contrast to the situation in *Automark*, the record before us contains objective facts, figures, and data from which the amount of Lyles' lost profits can be ascer-

5. In connection with Southwestern Bell's point of error seven, addressed later in our opinion, we note here that while the opinion mentions that this part of O'Dell's testimony was received as non-expert testimony, the court, in reversing, focuses on the absence of "objective documentation" not on the absence of expert opinion.

tained with reasonable certainty. Lyles testified that his employees keep daily records, called daily reports, on the sources of their business. These reports have been kept since he opened his business in 1981 and were kept for 1988, 1989, and 1990. Lyles presented computer records of the information contained in the daily reports showing the percentage of his profits that was generated by his Southwestern Bell Yellow Pages advertising each "issue year"[6] for the years 1985–1989. These figures were further supported by Lyles' introduction of Southwestern Bell's own promotional information stating that seven out of 10 Yellow Page calls are generated by display ads, the type of ad Lyles was denied in 1988. Lyles also presented evidence of the revenue that resulted from his Yellow Pages business broken down by "issue year," that is, a period of time that corresponds to the life of the particular Yellow Pages issue. Based upon the detailed records kept routinely by his office, Lyles testified that he suffered a total loss of $133,000 because of his exclusion from the 1988 Yellow Pages.

■ Evidence to establish profits must not be uncertain or speculative. *Southwest Battery Corp.*, 115 S.W.2d at 1098. An award of lost profits must be based upon objective facts, figures, or data from which the amount of the lost profits can be ascertained with a reasonable degree of certainty and exactness. *Verette v. Travelers Indem. Co.*, 645 S.W.2d 562, 569–70 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.).

The evidence presented by Lyles consisted of objective facts, figures, and data from which the trial court could have determined Lyles' lost profits with reasonable certainty and exactness. The type of proof offered by Lyles included documentary evidence containing summaries of data com-

piled daily by his employees over a nine-year period. The data established the amount of revenue generated by Southwestern Bell's Yellow Pages and that generated by other sources.[7] Based upon Lyles' data, it was possible to calculate with reasonable certainty the loss of profits attributable to his exclusion from the 1988 directory. We overrule point of error five.

■ Southwestern Bell next complains that the trial court abused its discretion in allowing Lyles to give expert testimony because Lyles had not timely designated himself as an expert in answers to Southwestern Bell's interrogatories. The record indicates that the trial court sustained Southwestern Bell's objection to any expert testimony by Lyles, but Southwestern Bell contends that the court allowed the testimony anyway. Specifically, it characterizes Lyles' testimony that he sustained $133,000 in damages as conclusory testimony based on a hypothetical scenario and concludes that because Lyles could not offer his opinion as to the total amount of his loss, there is no evidence to support the court's award of $100,000 in lost profits. Based upon our analysis in conjunction with point of error five, we do not agree.

■ The trial court properly allowed Lyles to present evidence of facts within his personal knowledge of his own business. The objective documentation and data presented was sufficient to support the trial court's conclusion that Lyles sustained damages in the amount of $100,000 in lost profits. If Lyles' testimony that his total economic loss amounted to $133,000 was improper, it was nevertheless harmless error. In a non jury case, the appellate court presumes that the trial judge, sitting as fact finder, disregarded any improperly admitted evidence. *Blanco v. Garcia*, 767

---

6. Southwestern Bell also complains that Lyles' figures and the court's award of damages were for 1988–89, while his claim was for damages suffered by virtue of his exclusion from the 1988 book only. A review of Lyles' exhibits, however, indicates otherwise. The 1988–89 figures correspond to the "issue year" of the 1988 directory. The issue year began in September 1988, when the 1988 Yellow Pages came out,

and includes that period between September 1988 and the issuance of the 1989 directory. It overlaps the calendar year. Therefore, there is no discrepancy.

7. Lyles also presented evidence that his overhead expenses were fixed no matter how many bonds he wrote.

S.W.2d 896, 898 (Tex.App.—Corpus Christi 1989, no writ). That presumption, combined with the fact that the trial court awarded a different amount from that claimed by Lyles, indicates that the court did not rely on the challenged testimony in awarding the damages. We overrule Southwestern Bell's sixth point of error.

 In its seventh point of error, Southwestern Bell claims that there is no evidence or, alternatively, insufficient evidence to support the trial court's award of DTPA damages. The gist of this complaint is that Lyles failed to produce expert opinion to support his claim of lost profits. Relying on *County Management, Inc. v. Butler,* 650 S.W.2d 888, 890 (Tex.App.—Austin 1983, writ dism'd), Southwestern Bell contends that expert testimony is *required* to establish a business enterprise's loss of revenues or profits.

The *County Management* case involved an action for lost profits resulting from breach of a contract to sell oil and gas leases. The plaintiffs maintained that the defendant's breach of the sale contract prevented their timely drilling of a well and that they ultimately suffered damages in the form of lost profits from the sale of the oil and gas which would have been produced by the lost well. The trial court awarded $6 million in lost profits. The Austin court held that the plaintiffs had failed to establish with sufficient certainty the amount of the damages claimed from the defendant's breach. Acknowledging that "proof of loss involving undrilled wells, lost leases, and royalties are, by their very nature, difficult to show," the court suggested a method for establishing such damages. 650 S.W.2d at 889–90. To meet his burden of proof in this situation, the plaintiff "should produce a qualified *expert* who … gives an *opinion as to the probability of obtaining production and the extent of such production* on the land in question." 650 S.W.2d at 890 (emphasis added). The court continued, "Such matters as production costs, geological trends, proration, kind and quality of the oil and countless other items, where applicable, should also

be referred to by the expert in making his opinion." *Id.*

While we agree that such highly technical projections as those involved in the *County Management* case might well require expert testimony, we do not consider Lyles' claim for lost profits to be nearly so technical or speculative. Lyles had routinely maintained business records for nine years, from which it was a fairly simple task to calculate with reasonable certainty his lost revenue. The requirement of an expert under the facts of the *County Management* case is not applicable to Lyles' situation.

 Furthermore, while expert opinion evidence *may* be offered to prove up the amount of lost profits, in the absence of highly technical issues, the cases do not *require* an expert's opinion to support an award of lost profits. *See generally Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 348 (1955); *Allied Bank West Loop,* 728 S.W.2d at 55; *Harper Bldg. Sys. v. Upjohn Co.,* 564 S.W.2d 123, 126 (Tex.Civ. App.—Beaumont 1978, writ ref'd n.r.e.); *Barbier v. Barry,* 345 S.W.2d 557, 563 (Tex.Civ.App.—Dallas 1961, no writ). As previously noted, the absence of expert testimony on the lost profits issue, although mentioned by the *Automark* court, specifically was held by the court not to be controlling. *Automark of Texas,* 681 S.W.2d at 829–30. We overrule point of error seven.

Southwestern Bell's eighth point of error, that the trial court erred in awarding Lyles his attorneys' fees, is based upon its earlier claim that Lyles failed to prove his DTPA counterclaim as a matter of law. Because of our disposition of that claim, we need not address point of error eight.

The trial court's judgment for Lyles on his counterclaim is affirmed.

O'CONNOR, J., dissents.

O'CONNOR, Justice, dissenting.

This case involves the statute of limitations and the discovery rule under the De-

ceptive Trade Practices–Consumer Act.[1] The issue is whether a party may ignore a written notice that informs him that he has no contract. The majority says he can; I say he cannot.

Southwestern Bell filed suit against Lyles in July 1988, for breach of two agreements for directory advertising in the 1986 and 1987 Yellow Pages. Initially, Lyles filed a general denial, but in April 1990, 20 months after the suit had been filed and one month before trial, Lyles amended his answer to add counterclaims for, among other things, a suit for violations of the DTPA. Lyle's theory of his DTPA suit was that Southwestern Bell's representatives, in obtaining a $5,000 deposit, told him the deposit would apply toward the 1988 advertisement. Instead of applying the deposit to the 1988 advertisement, Southwestern Bell applied it to the balance on Lyles' 1986 and 1987 accounts. Lyles argued at the trial court and here that Southwestern Bell gave him to understand that it would apply the $5,000 to reserve his advertising for the 1988 yellow pages. Thus, Lyles contends, when Southwestern Bell applied the deposit to the 1986 and 1987 accounts and Lyles was not able to get into the 1988 book, Southwestern Bell's actions on December 9, 1987, amounted to a deception for which he had a DTPA cause of action.

Lyles does not challenge the date of the initial misrepresentation. In his brief, Lyles states, however, that he did not *understand* that it was a misrepresentation (that his advertisement would not be in the 1988 book) until May 8, 1988, which is within the two-year statute of limitation. The trial court agreed with Lyles on the issue of discovery and found that the counterclaim was not barred by limitations.[2] Lyles does not maintain that he did not

*discover* he would not be in the 1988 book until May 8, 1988, but merely that he did not *understand* he would be in the Yellow Pages by that date.

Lyles cites no authority that a party's *understanding* of his rights is the foundation of the discovery rule. The question is not the party's understanding of the rights. Rather the question is when did Lyles discover, or when should he have discovered (in the exercise of reasonable care and diligence), the facts that established his DTPA cause of action?

**1. When did Lyles discover the misrepresentation?**

The first part of test in the discovery rule requires us to determine when Lyles discovered his advertisement was not in the 1988 Yellow Pages. The majority states that Lyles testified that he did not *realize* his advertisement was being excluded from the 1988 directory until May 7 or 8, 1988, when he was told that the Yellow Pages was closed and his ad was not included.[3] If Lyles did not realize his advertisement was excluded until May 7 or 8, it is not because Southwestern Bell did not tell him much earlier. Here is a review of communications from Southwestern Bell to Lyles after the critical December 9, 1987, meeting:

2–4–88 Lyles received a contract from Southwestern Bell that was "zeroed-out," and showed that Lyles had no 1988 advertising. Exhibit 34.

2–4–88 Lyles received a certified letter from Southwestern Bell telling him that he would have no 1988 advertising. Exhibit 35.

3–1–88 Lyles received a final notice from Southwestern Bell that his delinquent account had been fully accelerated and that

---

1. Tex.Bus. & Com.Code § 17.565, states:

All actions brought under this subchapter must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred or within tow years after the consumer discovered or in the exercise of reasonable diligence *should* have discovered the occurrence of the false, misleading or deceptive act or practice.

2. The court made the following finding of fact on the issue of discovery: Lyles could not have reasonably discovered these deceptive trade practices prior to May 8, 1988, which represents the date that limitations began to run on his DTPA counterclaim.

3. In his pleadings, Lyles contends that he did not discover that his advertisement was not in the 1988 book until after it was published. (Tr. 542.)

he was disqualified from future advertisement. Exhibit 36.

Exhibits 35 and 36 are reproduced in the appendix to this opinion.

The majority dismisses all three notices on the ground that the representatives from Southwestern Bell told Lyles at the December 9, 1987 meeting to ignore any "computer generated billings." Even if Lyles' testimony that a representative of Southwestern Bell made that statement is to be believed (Southwestern Bell disputes it), and Lyles could ignore any "computer generated billings," that did not give Lyles permission to ignore the contract that showed he had no 1988 advertisement and two letters telling him he had no 1988 advertisement. The contract and the two letters were neither "computer generated" nor "billings."

To discount the effect of the February 4, 1988, letter, the majority relegates it to a footnote and criticizes it for being a form letter. The majority acknowledges that the letter was signed by Bechner, the same representative who, according to Lyles, told him to disregard any computer generated billing statements he might receive. If Bechner actually told Lyles to ignore computer generated billing statements, a letter from Bechner telling him that he no longer had any advertisement would certainly undo the effect of the earlier oral statement.

In addition, Lyles testified he was "thoroughly shocked" by the February 4, 1988, letter. If Lyles was thoroughly shocked by the letter, certainly it was because it informed him he no longer had an advertisement in the 1988 book. Lyles elaborated on his interpretation of the letter in his testimony at trial:

I took it to mean what it says, that your paid '88 advertising is taken out of the book, and that you are now going to have to pay your past due amounts that is not the amount that our books reflected, and that we're not giving you any credit or adjustments, and thanks for the five thousand. You're not going in the book after eight or nine years.

Even under the majority's test, most would hold that Lyles, by this testimony, admitted he knew he had no advertising in the 1988 book on February 4, 1988, and limitations began to run on that date.

Other testamentary evidence that supports Southwestern Bell's claim that Lyles had notice much earlier than May 7, was the testimony of Lyles and his agent Combes. Both testified Lyles hired Combes to, among other things, get him into the 1988 book. Lyles hired Combes *after* the December 9, 1987, meeting, and thus both knew that he was not in the 1988 book after that meeting. Combes also testified that he knew the $5,000 payment was applied to the 1986 and 1987 delinquent accounts.

In my opinion, Lyles was put on notice by the February 4, 1988 letter that he had no advertising in the 1988 book, and the statute of limitation began to run on that date. If we applied that date, we would hold that Lyles delayed too long in filing his counterclaim.

**2. When should have Lyles discovered the misrepresentation?**

Even if the February 4 "zeroed out" contract, the February 4 letter, and the March 1 letter were not sufficient notice to Lyles that he was not in the 1988 book, we must then ask when Lyles, in the exercise of reasonable diligence, should have discovered that he was not in the 1988 book? If those three documents did not put Lyles on actual notice that he had no advertisement in the 1988 book, when should he have discovered that he had no advertisement in 1988 book?

The second part of test in the discovery rule requires us to determine when Lyles should have discovered he was not in the 1988 Yellow Pages. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988). To answer this question, we must apply the reasonably prudent person standard: When did the person who seek the benefit of the discovery rule have enough information to lead him, as a reasonably prudent person, to make an inquiry that would lead to the discovery of the wrong? *Id.* For limitations purposes, a party's knowledge of facts, conditions, or circum-

stances which would cause a reasonable person to make inquiry is, in law, the equivalent to actual knowledge of the cause of action. *See Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex.1983) (limitations in a medical malpractice case).

If the February 4 "zeroed out" contract, the February 4 letter, and the March 1 letter were not actual notice (which I believe they were), under the second part of the test, they would have caused a reasonably prudent person to make an inquiry about the status of the advertisement in the 1988 book. Instead of applying the reasonably prudent person test, the majority takes at face value Lyles' statement that he did not understand his advertisement was not in the Yellow Pages until May 8, 1988. In failing to apply the reasonably prudent person test, the majority errs.

I would sustain this point, and reverse and render in favor of Southwestern Bell.

EXHIBIT 35

Southwestern Bell
Yellow Pages

520 Post Oak Blvd., Room 480
Houston, Texas 77027

NAME FREEDOM Boudin Co
ADDRESS 1310 CONGRESS
ACCOUNT NUMBER TO12654500
TELEPHONE NUMBER (713) 373-3366

**· RECEIVED**

**FEB 04 1988**

Dear

 It has been brought to our attention that your account is seriously delinquent. For this reason this will be your only notification that your present paid directory advertising has been removed from the upcoming '88 issue of the Greater Houston Southwestern Bell Yellow Pages.

 Unless this delinquency matter is addressed immediately, future credit privileges are at risk and prepayments in the amount of 35% for future advertising will be required.

 If you have any questions, you can reach me at _850-4123_ between the hours of 8:00 a.m. and 5:00 p.m Monday through Friday.

ERIC BECHNER

Plaintiff's
EX. 35

EXHIBIT 36

 Southwestern Bell Yellow Pages

SW BELL YELLOW PAGES
P.O. BOX 300055
DALLAS TX 75303-0055
TEL NO: 1-800-443-6200
FEB 25 1988

**RECEIVED**

VERNON P LYLES
325 HEIGHTS BLVD
HOUSTON TX 77007-2517
T012654500
713-373-3366

**MAR 01 1988**

Dear Customer :

Because you have failed to recognize your responsibility involving your debt, I am forced to send you this FINAL NOTICE.

This is the final billing you will receive from us regarding your billed advertising charges. Due to your seriously delinquent balance, the billing for this account in the amount of $56,465.77 will be removed from your account and referred for third-party collection action. Even though this billing will no longer appear on your bill, it is still considered outstanding and you no longer qualify for future Yellow Pages advertising without full payment of this amount. Also, since your credit privileges are being rescinded, any future advertising (upon complete payment of your delinquent balance) will require a 35% prepayment.

Please forward a payment of $56,465.77 to be received in our office by March 16, 1988, so that it will be possible for us to avoid taking this unpleasant and drastic action.

GENERAL MANAGER
CREDIT AND COLLECTIONS

Plaintiff's
EX. 36