Opinion issued on June 15, 2006






 



     





In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00711-CV




JAMES K. HANCOCK, Appellant

V.

CALVIN GENZER AND SANDI GENZER, INDIVIDUALLY AND D/B/A
TRINITY HOME IMPROVEMENT, Appellees




On Appeal from the 125th District Court
Harris County, Texas
Trial Court Cause No. 2003-18930




MEMORANDUM OPINION
          Appellant, James K. Hancock, appeals the trial court’s take-nothing judgment
in favor of appellees, Calvin Genzer and Sandi Genzer, individually and d/b/a Trinity
Home Improvement (collectively “Genzer”), on Hancock’s Texas Deceptive Trade
Practices Act (“DTPA”), fraud, and breach of contract claims. In eight points of
error, Hancock asserts that the trial court erred in granting judgment for Genzer
because the trial court’s findings of fact are against the overwhelming weight of the
evidence. We affirm.
Background
            Hancock’s house sustained roof damage in 2001 during Tropical Storm
Allison. After noticing that the roof was leaking and water was seeping into the
house, Hancock called his insurance company, Farmer’s Insurance, to assess the
damage. Due to the amount of damage that Tropical Storm Allison caused, the
insurance adjuster was not able to come to Hancock’s house immediately. The rain
continued to come into the house until an adjuster arrived. Once there, the adjuster
noticed that there was too much water in the house and that the insurance company
needed to send in a mold adjuster within 24 hours.
           Farmer’s Insurance sent mold adjuster, Nina Henry, to the Hancock house and
assess the mold damage. Nina brought her husband, Bill Henry, to serve as her
estimator. Later, Hancock met with Mr. Henry and Calvin Genzer, owner of Trinity
Home Improvement (“Trinity”), to discuss hiring the company to perform the mold
remediation at the house. Hancock testified that Genzer used Mr. Henry as his
estimator and paid him 10% of the cost of the mold remediation job. He further
testified that, after a walk through the house with Genzer and Mr. Henry, Hancock
hired them to do the work on his house. Hancock said that Genzer and Mr. Henry
told him that they had insurance coverage for anything that went wrong on the job
and that their company was bonded. Hancock stated that he hired Genzer to perform
the remediation because Genzer was supposed to have been certified as a mold
remediator and; therefore, he knew the proper procedures for abating mold without
spreading it or destroying the property. Later, Hancock discovered that this was
Genzer’s first job.
          Hancock testified that he paid Genzer $20,000 on June 21, 2002 for work
performed at the residence. A second check for $20,000 was written on July 31, 2002
as an advance payment for additional work that needed to be done on the house, but
that Hancock claimed was never performed. He testified that, when Genzer did not
return to complete the work on the house, Hancock found the house in what he called
“shambles, totally destroyed.” He testified that the walls, ceilings, and floors were
destroyed and that there was wiring hanging down, debris all over, and door casings
missing. A few months later, Hancock sent a letter advising Genzer that he no longer
wished to retain Genzer and Trinity for the remediation or build-back of his house. 
The letter also informed Genzer that he was no longer authorized to enter the
property.
          On cross-examination, Hancock testified that he originally hired Cotton
Remediation Company to do tear-out work on his house. He fired Cotton from
further work on the house after it removed kitchen cabinets at the ceiling level when
the mold was at the base boards. Hancock also testified that, after firing Genzer, he
hired other people to do repairs on his house. He also hired laborers to clean the
house and remove debris, as well as, a company to repair structural damage he alleged
Genzer caused when removing insulation from the ceilings. 
          Louis Battaglia, a microbiologist who consulted for companies investigating
mold infestation, testified for Hancock. Although he was not qualified as an expert
witness in mold remediation, Battaglia testified that he taught the microbiology
section of mold remediation qualification course attended by Genzer and Mr. Henry. 
He said that Mr. Henry contacted him to request a referral for a company that does
mold investigations. Battaglia recommended Reliant Environmental, who later did
an investigation on Hancock’s house. Battaglia also testified that he performed an
investigation of the house at the request of Mr. Henry in 2002 and then again later at
the request of Hancock. In the later report requested by Hancock, Battaglia
concluded that “it was obvious that the removal of the ceilings and HVAC ducts were
probably not necessary.” Further, he testified that, in his opinion, the Hancock house
was “unlivable.”
          Melissa Bohannon testified that she was employed as an insurance agent and
licensed insurance adjuster who had experience working on mold claims. Bohannon
testified that, when she visited Hancock’s house, she found it “basically stripped to
the studs” and uninhabitable. 
          Calvin Genzer testified in defense of the claims against him. When asked why
he and his company failed to repair and remediate Hancock’s house as Hancock
alleged, Genzer stated that there was never a contract to repair and remediate. He
testified that, although Hancock’s house was his first mold remediation job, he had
been certified by Enviro Test and sought the assistance of someone with two years
of professional remediation experience, Sam Trujillo. Trujillo was recommended by
the Enviro Test instructors as someone who was experienced and could put together
a professional team to perform the remediation. Genzer testified that Trujillo served
as the foreman for the remediation job on Hancock’s house. 
          Genzer further testified that he had a chance to view the Hancock house and
the photographs of the house previously admitted as evidence. Viewing the pictures,
he stated that the walls that were torn out in the back of the house and the loose wires
on the floor were not his practice and not his work. Genzer testified that, when he left
the job site, Hancock’s house was spotless. He said that he vacuumed the entire job
with HEPA vacs


 and that there was not a “tiny piece of little wood, or a screw, a nail,
nothing. Everything is vacuumed and cleaned.” When asked to look at photographs
of containment procedures at the Hancock house, Genzer testified that a lot of what
was visible in the photographs was not his work and appeared to have been done after
he left the job. 
          Genzer admitted that his tear-out job included removal of ceiling drywall in the
garage, hallways, utility room, game room, bedrooms, bathrooms, and kitchen. He
testified that Hancock told him that there were 13 leaks in his house and that the
ceilings were full of mold. Once Genzer cleared out all of the ceiling drywall, he did
not find any mold or evidence that water had ever leaked onto the joists or rafters in
the attic. Genzer testified that Hancock attempted to supervise the work done on his
house and often insisted that the house was full of mold. After Genzer told Hancock
that there was no mold found in the ceilings, Hancock insisted that the walls were full
of mold. Genzer testified that Hancock once insisted: “It just had to be there. It has
to be there. I can smell it. It affects me. Every time I go in the house I just get sick.” 
          Genzer testified that, after he and his company performed the initial tear-out,
he told Hancock that he was unable to go any further without a contract for more
work. He had been paid a total of $40,000 and was unable to perform additional
services without the proper paperwork and a contract. Genzer stated that he and
Hancock never reached an agreement to build back the Hancock house and never
received approval from any insurance carrier to perform such work. Despite his
testimony that Hancock continued to beg him to tear out all of the sheetrock walls in
the house, Genzer insisted that there was never an agreement to perform additional
work. Additionally, Genzer testified that he never represented to Hancock that his
company was bonded. 
          At trial, Hancock alleged DTPA, fraud, and breach of contract claims against
Genzer. Hancock argued that Genzer failed to disclose that the repair and
remediation services being sold to him were insufficient to effectively remedy the
condition of his house. He further alleged that Genzer defrauded him and breached
their contract for mold remediation services. The trial court granted judgment for
Genzer following a trial to the court. The trial court made the following findings of
fact and conclusions of law:
Findings of Fact
1.Plaintiff purchased services from Defendants and reached
an agreement with Defendants that Defendants would
provide such services to Plaintiff in connection with the
Plaintiff’s residence. 
 
2.Defendants did not fail to provide the agreed services to
Plaintiff.
 
3.Defendants did not make false or misleading statements of
fact to Plaintiff concerning the characteristics or condition
of the services Defendants agreed to provide to Plaintiff.
 
4.Defendants did not make false or misleading statements of
fact to Plaintiff concerning the nature of the services
Defendants agreed to provide to Plaintiff, the physical type
of services to be provided, the extent of the services to be
provided, or the type or kind of services to be provided.
 
5.Defendants did not represent that services purchased by
Plaintiff were of a particular standard, quality or grade,
when they were of another. 
 
6.Defendants did not represent to Plaintiff that the services
to be provided by Defendants were backed by or supported
by a bond, when in fact, they were not.
 
7.Defendants did not fail to disclose to Plaintiff that
additional services known to Defendants at the time the
services were sold to Plaintiff were needed to effectively
remediate the residence.
 
8.Defendants did not misrepresent to Plaintiff that certain
services would be provided by Defendants, which were not
provided.
 
9.Plaintiff has not suffered damage as a result of the acts or
omissions of the Defendants.



Conclusions of Law
 
1.Defendants did not breach their contract with Plaintiff.
 
2.Defendants have not violated the [DTPA].
 
3.Defendants’ actions do not constitute unconscionable
conduct under the [DTPA].
 
4.Defendants have not committed fraud against the Plaintiff.
 
5.Plaintiff is not entitled to recover damages from
Defendants.
 
6.Plaintiff is not entitled to recover attorney’s fees from
Defendants.
 
7.Defendant is not entitled to recover attorney’s fees from
Defendants.

Factual Sufficiency
          In eight points of error, Hancock complains that findings of fact two through
nine are against the overwhelming weight of the evidence. He argues that the great
weight of the evidence before the trial court shows that his allegations of DTPA
violations, breach of contract, and fraud were established. We disagree. Standard of Review
          In an appeal from a bench trial, a trial court’s findings of fact have the same
weight as a jury’s verdict. Amador v. Berrospe, 961 S.W.2d 205, 207 (Tex.
App.—Houston [1st Dist.] 1996, writ denied). When challenged, findings of fact are
not conclusive if, as here, there is a complete reporter’s record. Id. When there is a
reporter’s record, the trial court’s findings of fact are binding only if supported by the
evidence. Id. If the findings are challenged, we review the sufficiency of the evidence
supporting the findings by applying the same standards that we use in reviewing the
legal or factual sufficiency of the evidence supporting jury findings. Catalina v.
Blasdel, 881 S.W.2d 295, 297 (Tex.1994).
            When a party attacks the factual sufficiency of an adverse finding on an issue
where he had the burden of proof, he must demonstrate that the adverse finding is
against the great weight and preponderance of the evidence. Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing a great weight and
preponderance issue, we must (1) examine the record to determine if there is some
evidence to support the finding and, if so, (2) determine, in light of the entire record,
whether the finding is so contrary to the overwhelming weight and preponderance of
the evidence as to be clearly wrong and unjust. See id. In doing so, we must “detail
the evidence relevant to the issue” and “state in what regard the contrary evidence
greatly outweighs the evidence in support of the verdict.” Id.     
          We must also employ appropriate deference so that we do not substitute our
judgment for that of the fact finder. See Merckling v. Curtis, 911 S.W.2d 759, 763
(Tex. App.—Houston [1st Dist.] 1995, writ denied). In a bench trial, the trial court,
as factfinder, is the sole judge of the credibility of the witnesses. S. W. Bell Media,
Inc. v. Lyles, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ
denied). It may take into consideration all the facts and surrounding circumstances
in connection with the testimony of each witness and accept or reject all or any part
of that testimony. Id.
          Hancock testified that several companies performed work on his house. He
first hired Cotton to tear down parts of the kitchen. After he fired Cotton for tearing
out too much of the kitchen, Hancock hired Genzer. The evidence shows that, after
Hancock sent Genzer a letter terminating his employment and restricting him from
accessing the property, he hired several more companies to do additional work on the
house. While the photographs show that the house experienced significant damage,
it is unclear from the record who caused the destruction. 
          In this case, photographs of the damage to Hancock’s house were admitted into
evidence. Hancock was the only witness called to testify regarding which company
caused the damage. He testified that Genzer caused all of the damage to his home. 
In response, Genzer testified that the destruction depicted in the photographs was not
caused by him or his company.  Furthermore, Hancock testified that Genzer
represented that his company was backed or supported by a bond. Genzer testified
that he never represented to Hancock that he had a bond to do this project. 
          Here, the parties to the suit were the primary witnesses at trial. Under these
circumstances, the determination of the disputed issues was for the trial court. After
hearing all the evidence, the trial court concluded that Genzer did not (1) breach the
contract with Hancock; (2) violate the DTPA; (3) act unconscionably; or (4) commit
fraud against Hancock. Hancock does not complain of the trial court’s conclusions
of law.
          Having viewed all of the evidence in a neutral light, we hold that the findings
made at trial were not so contrary to the overwhelming weight and preponderance of
the evidence as to be clearly wrong and unjust. See Francis, 46 S.W.3d at 242. 
Accordingly, we overrule Hancock’s eight points of error.
Conclusion
          We affirm the judgment of the trial court. 

                                                             George C. Hanks, Jr.
                                                             Justice
 
Panel consists of Justices Jennings, Hanks, and Higley.