

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00234-CV

**IN THE INTEREST OF J.F.B.**, E.C., A.J.C., and A.L.C.

From the 218th Judicial District Court, Wilson County, Texas
Trial Court No. 13-10-0610-CVW
Honorable Melissa Uram-DeGerolami, Associate Judge Presiding

Opinion by:　　Luz Elena D. Chapa, Justice

Sitting:　　　Sandee Bryan Marion, Chief Justice
　　　　　　　Marialyn Barnard, Justice
　　　　　　　Luz Elena D. Chapa, Justice

Delivered and Filed:　October 7, 2015

AFFIRMED

Dorothy Denee B. appeals the trial court's termination of her parental rights to her four children, J.F.B. (born in 2003), E.C. (born in 2006), A.J.C. (born in 2008), and A.L.C (born in 2012).[1] Louis C. Jr. appeals the trial court's termination of his parental rights to the three younger children. J.F.B.'s father resides in Alabama, and his parental rights are not at issue in this case. Dorothy B., the children's maternal grandmother, appeals the trial court's order denying her request for sole managing conservatorship. We affirm the trial court's judgment.

---

[1] To protect the identity of the minor children, we refer to the children's parents and maternal grandmother by their first names and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

## PROCEDURAL BACKGROUND

In October 2013, the Department of Family and Protective Services filed a petition for conservatorship of the four children and for termination of Dorothy Denee's and Louis's parental rights. Dorothy B. filed a petition in intervention for sole managing conservatorship of the children. Louis was an inmate in the Institutional Division of the Texas Department of Criminal Justice (TDCJ) during the trial court proceedings. After the Department filed its petition, the children were removed from Dorothy Denee and placed with Dorothy B. The Department then removed the children from Dorothy B. and placed them in the care of a foster family. Following a bench trial, on April 6 and 7, 2015, the trial court rendered judgment terminating Dorothy Denee's and Louis's parental rights, denied Dorothy B.'s request for sole managing conservatorship, and awarded the Department permanent managing conservatorship of the children. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

### A. Standard of Review & Applicable Law

Both Dorothy Denee and Louis challenge the sufficiency of the evidence to support the trial court's findings that termination of their parental rights is in the children's best interest.

Judgments terminating parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West 2014). To determine if this heightened burden of proof was met, we employ a heightened standard of review—judging whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role. *Id.* at 26. We are not to reweigh issues of witness credibility but "must defer to the [factfinder's] determinations so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

Legal sufficiency review requires us to examine the evidence "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.B.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.* But we may not simply disregard undisputed facts that do not support the finding; to do so would not comport with the State's heightened burden of proof by clear and convincing evidence. *Id.*

When conducting a factual sufficiency review, we evaluate "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.* We hold the evidence to be factually insufficient only if, in the light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction. *Id.*

The best-interest determination is a wide-ranging inquiry, and the Texas Supreme Court has set out some factors relevant to the determination:

- the desires of the child;
- the emotional and physical needs of the child now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of the individuals seeking custody;
- the programs available to assist these individuals to promote the best interest of the child;
- the plans for the child by these individuals or by the agency seeking custody;
- the stability of the home or proposed placement;
- the acts or omissions of the parent which may indicate that the existing parent–child relationship is a proper one; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). The list is not exhaustive, and not every factor must be proved to find that termination of the parent-child relationship is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest—especially when undisputed evidence shows that the parental relationship endangered the child's safety. *Id.* "Evidence that the parent has committed the acts or omissions prescribed by section 161.001 may also be probative in determining the child's best interest; but the mere fact that an act or omission occurred in the past does not *ipso facto* prove that termination is currently in the child's best interest." *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) (internal citation omitted). However, a factfinder may measure a parent's future conduct by his or her past conduct in making the best-interest determination. *Id.*

## B. Dorothy Denee's Challenge to the Sufficiency of the Evidence

Dorothy Denee's sole issue is that there is legally and factually insufficient evidence to support the trial court's finding that termination of her parental rights is in the children's best interest.

### 1. The Evidence Regarding Dorothy Denee

Several witnesses provided testimony regarding the children's relationship with Dorothy Denee. Tiffany Garza, a Child Protective Services investigator, testified the Department received a referral alleging Dorothy Denee was using drugs and neglecting the children. She testified that Dorothy Denee admitted to being depressed and using methamphetamines daily. Dorothy Denee also admitted to domestic violence between her and Louis, the three youngest children's father; the incidents included some physical and emotional abuse, but Garza was unsure whether the children were ever present during those incidents. Garza stated Dorothy Denee would leave the

children in the care of her mother, Dorothy B., for days at a time, and Garza had concerns about the cleanliness of Dorothy B.'s home.

Erica Jones, a teacher at the children's elementary school, testified that when she would give A.J.C. food, he would hide it or try to eat is as quickly as possible and "act as though he was never going to get anymore [sic]."

Robin Hamiter, a counselor at the children's elementary school, testified she knew the three younger children and had concerns about the cleanliness of their clothes. She testified she was concerned about how much the children were eating at home because "they would always ask for seconds" and "they would put extra food in their backpacks."

Dorothy B. testified that before the children were placed with her, there were problems at home such as there being "no food at home," which is why the children would take extra food from school and why A.L.C. would search the trash for food.

Elsa Castleberry, a licensed professional counselor, testified she was asked to provide individual counseling services to Dorothy Denee. Castleberry testified, "I went over the basics, which I review with most individuals; communication, coping, boundaries. With [Dorothy Denee] I went over things like just trying to develop a stronger sense of self, trying not to rely on others but more security and self-esteem in regards to herself." Castleberry asked Dorothy Denee to write an apology letter to her children to develop empathy but she did not write the letter. Castleberry explained that Dorothy Denee was not quite sure what they might be feeling and wanted to wait for them to discuss it with her. Castleberry testified Dorothy Denee used drugs for about a year and a half and had a relatively short period of sobriety. She also testified there was uncertainty about whether Dorothy Denee would reunite with Louis. Castleberry stated she believed Dorothy Denee "has a very supportive family. She has the skills she learned while in treatment and while in counseling; communicating, seeking support, involvement in activities, [and] staying busy."

Castleberry testified she would not feel comfortable permitting Dorothy Denee to retain the sole responsibility for making decisions, such as schooling and medical decisions, for the children.

Dr. Jacob Pickard, a clinical psychologist, testified he was assigned to evaluate Dorothy Denee, assess her functioning, her parenting capacities, identify any risk factors, and make suggestions for services to address those risk factors. He identified Dorothy Denee's mental health issues and history of domestic violence and mutual substance abuse with Louis as risk factors. Dr. Pickard stated Dorothy Denee had maintained her sobriety from July 2014, but testified there were major risk factors concerning Dorothy Denee's sobriety, including the possibility of Dorothy Denee getting back together with Louis and her willingness to go to counseling and obtain medication to treat her mental health issues. Dr. Pickard stated that Dorothy Denee informed him that she had used drugs as a way of self-medicating and as a way of coping with her separation from Louis. He also testified Dorothy Denee's mental health issues included depression and postpartum depression. She had been prescribed medication for both, had stopped taking the medication due to forgetfulness, and then decided not to continue the medication. Dr. Pickard stated she told him she would take the medication if she "was forced to." He further stated Dorothy Denee would need to leave the children with Dorothy B. while Dorothy Denee worked, but she also expressed that her relationship with Dorothy B. was strained after the children were removed from Dorothy B.

Manuel Davis, a licensed professional counselor, conducted group therapy with the children. He testified J.F.B. has a very strong connection with Dorothy B. and becomes very emotional about his future placement. Davis testified J.F.B. was concerned about being separated from his siblings and he is "very attached" to them. He testified J.F.B. also has a bond with his mother and is very protective of her. Davis stated J.F.B. believed he was in foster care because Dorothy Denee slept a lot, did not get him up for school on time, and he had to take care of the

younger three children. J.F.B. told Davis that he believed it was his responsibility to take care of himself and his siblings. Davis expressed concern that J.F.B. did not realize that having to care for his three younger siblings was causing some anxiety for him, and would cause him to "break down and cry," which Davis testified he observed. Davis recommended the children stay together due to their bond and to maintain the consistency of living together. J.F.B. told Davis he wanted to stay with Dorothy Denee. However, Davis testified that the children were bonded with the foster parents and the children's mood improved after being placed with them. Davis explained, for example, that A.J.C.'s "meltdowns" had been "less frequent and less intense." Davis testified the foster parents were meeting the children's emotional needs.

Stacey Newvine, the children's foster mother, testified the children were "filthy" when they came to her home. She testified A.L.C. had only one outfit when she arrived and her blouse was too small for her. Newvine stated J.F.B.'s grades are As, Bs, and Cs, E.C. is on the "AB" honor roll, and A.J.C.'s teacher said he is "doing very well." Newvine testified she had to prompt J.F.B. to shower, A.J.C. would scream if she tried to help him shower, and she needed to remind E.C. to use a loofa and shampoo. Newvine further testified the children seem a lot happier, have had a very consistent schedule, and are very active with church and taekwondo. Newvine stated she helps them with their homework every day, is able to take them to all their medical and dental appointments, and would consider adoption if the kids had no place to go. Newvine testified the children were excited to see Dorothy B., and after the majority of visits with her, J.F.B. left crying.

Belinda Medina, a CPS caseworker who coordinated and supervised the children's visits with Dorothy Denee and Dorothy B., testified the children enjoyed the visits and would compete for their mother's and grandmother's attention. She stated J.F.B. appeared bonded with Dorothy Denee, but A.J.C. did not seek her attention. Medina also stated Dorothy Denee relied on J.F.B. to monitor the other children and she would not intervene until situations had escalated. In Medina's

opinion, Dorothy Denee was not capable of supervising all four kids and did not show any progress over the year of visits. Medina stated she had to intervene at least one time each visit. She testified the children, like all children during visits, hoped to go back home with their parents.

Lynn Baker also testified for the Department. Baker stated that after a walkthrough of Dorothy Denee's home, Baker believed Dorothy Denee was not ready to have the children back because there was only one bed for the children and no bedding. She was also concerned that there was no improvement in Dorothy B.'s home. She testified Dorothy Denee had not indicated that she had any future plans for the kids, but did plan to get beds once she had the kids back. Baker stated J.F.B. told her he wanted to go live with his father in Alabama but then changed his mind and stated he wanted to go back and live with his mother because she "is awake now." Baker admitted Dorothy Denee had been functioning well, despite not taking her medication for depression. However, Baker stated that at the last hearing before trial, she observed Dorothy Denee and Louis "in a full embrace," which appeared romantic, and "they were kissing."

Helen B., Dorothy B.'s mother and a recently retired nursing home administrator, testified she would help Dorothy Denee take care of the children if she kept her parental rights.

Dorothy Denee testified she had tried marijuana and cocaine, but "stuck to meth" in 2012. She explained that although she used methamphetamines twice a month before the children were removed, she started using daily after the children were removed. Dorothy Denee admitted she did not realize the seriousness of the situation until the children were removed from Dorothy B.'s home. She then started "working on [her] services" for about a month but then relapsed. Dorothy Denee testified she was admitted to an in-patient rehabilitation facility for seventy days and had been sober since July 21, 2014. She also testified she obtained a job at Wal-Mart. Dorothy Denee stated that if the trial court did not terminate her parental rights, she would get beds immediately

and buy food for the children. She admitted she only had $60 in her bank account but would receive a $500 paycheck the day after trial.

Dorothy Denee stated that although she was prescribed medication, she stopped taking her medications when she was using methamphetamines. She testified she did not like the way her medications made her feel. Dorothy Denee stated she completed domestic violence courses and learned enough in those classes to protect herself and her children from domestic violence in the future. She also stated the children were always excited about their visits but commented the Department would not let her explain to the children what was going on.

Dorothy Denee testified she would act "dramatic" and call police when she fought with Louis and, after Louis went to prison, she started seeing other men who would bring drugs to her home. She testified that when men went to the house, she would send the children to their bedroom. Dorothy Denee explained she engaged in a pattern of staying up all night and sleeping all day, and she would sometimes take the children to school while she was under the influence of drugs. She admitted her relationship with Louis was a danger to the kids "whenever it would get bad." She also admitted her drug use endangered the children. Dorothy Denee stated that instead of going to AA or NA meetings, she had learned in rehabilitation that she should get connected with the church and she now attends on Sunday. She also stated that instead of having an AA sponsor, she utilizes the sober network she joined during rehabilitation.

Dorothy Denee testified she had other resources, including Dorothy B. and Helen B., to help her with the children, to make car payments, and to pay her bills. She admitted she should have saved more money in preparation for the return of her children. Dorothy Denee stated she wanted to co-parent with both Louis and J.F.B.'s father, but when asked if she intended "to go back with [Louis]," she responded, "Probably not."

   *2. Analysis*

The evidence shows J.F.B. expressed a desire to live with his mother, was very bonded with his siblings, and wanted to remain with them. CPS investigator Medina testified the children hoped to return home to their parents. This factor weighs in favor of retaining Dorothy Denee's parent-child relationship with J.F.B., E.C., and A.J.C. At the time of trial, A.L.C. was three. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). There was evidence that both Dorothy Denee and the foster parents cared for and were bonded with A.L.C.

The evidence shows that before the removal of the children, Dorothy Denee used methamphetamines about twice a week and she used drugs with others while the children were at home. Her drug use resulted in her engaging in a pattern of staying up all night and sleeping all day, and she had taken the children to school while under the influence of drugs. Dorothy Denee admitted that after the children were removed, she used methamphetamines daily for about seven months. She had made an attempt during those seven months to complete her service plan, but then relapsed and continued to use drugs. Dorothy Denee admitted her drug use endangered the children.

Dorothy Denee also had a history of exposing the children to domestic violence. CPS investigator Garza testified that the children reported domestic violence. Dorothy Denee acknowledged that her relationship with Louis involved domestic violence, which included pushing, shoving, and emotional abuse, endangered the children. *See In re A.M.*, 385 S.W.3d 74, 82-83 (Tex. App.—Waco 2012, pet. denied) (analyzing exposure of children to domestic violence as supporting the trial court's best-interest finding).

The evidence shows that Dorothy Denee failed to provide sufficient food for the children. Elementary teacher Jones testified the children displayed behaviors, such as eating quickly and hiding food to take home, suggesting they were not being sufficiently fed at home. There was also testimony that A.L.C., the youngest child, dug through the trash to find food because there was no food at home. Dorothy Denee testified that if the trial court did not terminate her parental rights, she planned to immediately buy food for the children. Although she testified she had to purchase beds for the children and had, at the time of trial, only $60 in her bank account, she also testified she would receive her paycheck in the amount of $500 the day after trial. Dorothy B. and Helen B. would help her with expenses in providing for the children.

With regard to Dorothy Denee's parental abilities, the evidence showed that before the children's removal, Dorothy Denee would leave her children for days at a time. Dorothy Denee completed her family service plan, including counseling with Counselor Castleberry, but Castleberry was concerned that Dorothy Denee was unwilling or unable to complete an assignment to demonstrate she could develop empathy for what her children had experienced. During the Department-supervised visits with the children, Dorothy Denee would often, as she did before the children's removal, rely on J.F.B. to take care of his younger three siblings. Davis testified that Dorothy Denee's reliance on J.F.B. caused him anxiety and to "break down and cry." Conversely, there was evidence the children were well cared for by the foster parents, the children were doing well in school under their care, and the foster parents planned to adopt the children if they had no place to go.

Dorothy Denee stated her plans for taking care of the children included co-parenting with Louis, and testified she "probably" would not become romantically involved with him. There was evidence showing he sold methamphetamines out of the home while the children were present. It was also undisputed that Louis had convictions for kidnapping, possession of marijuana, domestic

violence involving Dorothy Denee, and a violation of a protective order. *See id.* (holding future plans to have a convicted felon in a parent's life weighed in favor of best-interest findings).

Dorothy Denee testified she successfully completed an in-patient drug rehabilitation program and took classes in which she learned how to protect herself and her children from domestic violence. She testified she had been sober since July 2014, and the Department's witnesses had no reason to believe she had relapsed since then. Dorothy Denee explained that instead of relying on a sponsor and attending AA or NA meetings, she maintained her sobriety by utilizing the "sober network" she developed while in rehabilitation and attending church. Dorothy Denee also completed her family service plan, which included programs designed to facilitate the reunification of the children with the parents. Castleberry testified Dorothy Denee developed skills from treatment and counseling.

"[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue." *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A factfinder is "not required to ignore a long history of dependency and abusive behavior merely because it abates as trial approaches." *Id.* at 513. Dr. Pickard testified the major risks were (1) the possibility that Dorothy Denee would become romantically involved with Louis again and (2) Dorothy Denee's unwillingness to take her medication for depression. Dorothy Denee admittedly planned to co-parent with Louis. Although Dorothy Denee testified she did not intend to "go back" with Louis, CPS caseworker Baker testified she observed Dorothy Denee romantically embracing and kissing Louis in the courtroom at a hearing before the trial. Dorothy Denee testified she would take her medication if it meant remaining the children's mother, but Dr. Pickard testified Dorothy Denee told him she would only take her medication if she was "forced" to do so. The trial court could have credited Baker's and Dr. Pickard's testimony and inferred from the evidence and Dorothy Denee's past

conduct that she was likely to become romantically involved with Louis again and not take her medication. Dorothy Denee admitted that she turned to drugs to self-medicate when she was separated from Louis. The trial court could have formed a reasonably firm conviction or belief that it was uncertain whether Dorothy Denee's rehabilitation would continue in the future. *See id.* at 513-14.

Given Dorothy Denee's undeniable history of exposing the children to domestic violence, drug use, endangering the children's safety, and neglecting their needs, as well as her plans to have a co-parenting relationship with Louis, we hold legally and factually sufficient evidence supports the trial court's finding that termination of Dorothy Denee's parental rights was in the children's best interest.

## C. Louis's Challenge to the Sufficiency of the Evidence

Louis also argues there is legally and factually insufficient evidence to support the trial court's finding that termination of his parental rights is in E.C., A.J.C., and A.L.C.'s best interest.

### 1. The Evidence Regarding Louis

Garza, the CPS investigator, testified Louis was incarcerated for illegally possessing a handgun and for violating a protective order. Louis's criminal history included kidnapping, possession of marijuana, and "three separate domestic violence criminal issues involving . . . [Dorothy Denee]." The children made some reports of domestic violence between their parents and said that Louis "was selling ice out of the house and also using ice out of their home." The children told Garza that several men came in and out of the home and the children were in the home when "the drug use occurred."

Baker testified Louis was incarcerated, failed to complete his family service plan, had no visitation with the children, and called them only once. She further testified Louis was unable to meet the emotional and physical needs of the children because of his criminal convictions and

history of domestic violence and drug use. Baker testified Louis became parole-eligible in September 2015.

Louis testified he was a TDCJ inmate and would be parole eligible in September 2015, but if required to serve his maximum sentence, he would be incarcerated until October 2019. He stated he had good behavior, no major disciplinary cases, took classes on parenting and carpentry, attended AA meetings, and worked in the kitchen. Louis testified he had a "very good" relationship with Dorothy Denee but they were probably not going to get back together. Louis admitted he had used cocaine and "ice" but denied using drugs with Dorothy Denee. He also described the domestic violence "assaults" as "pushing and shoving."

### 2. *Analysis*

There was evidence that Louis sold drugs out of the home, exposed the children to domestic violence, and had three criminal convictions for incidents of domestic violence involving Dorothy Denee. He also had criminal convictions for kidnapping and possessing a firearm. Although Louis testified he did not plan to reunite with Dorothy Denee, Baker testified she observed Louis and Dorothy Denee romantically embracing and kissing in the courtroom at a hearing before the trial. The trial court reasonably could have considered that Louis's repeated drug use, acts of violence, and criminal conduct would continue in the future. *See In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re D.M.*, 58 S.W.3d 801, 817 (Tex. App.—Fort Worth 2001, no pet.) (holding inability to maintain a lifestyle free from arrests and incarcerations is relevant to a best-interest finding). Furthermore, there was evidence that after the children were removed, Louis attempted to contact the children only once. Although Louis testified he would be willing to financially support the children, we hold legally and factually sufficient evidence supports the trial court's finding that termination of Louis's parental rights to E.C., A.J.C., and A.L.C. is in the children's best interest.

## POSSESSORY CONSERVATORSHIP

In his second issue, Louis argues the trial court erred by impliedly denying him possessory conservatorship of the children because the Department did not request that he be denied possessory conservatorship. The Department requested that the trial court terminate Louis's parent-child relationship with his children. "[A]n order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides." TEX. FAM. CODE ANN. § 161.206(b) (West 2014). A parent's rights and duties include "the right to have physical possession, to direct the moral and religious training, and to designate the residence of the child." *Id.* § 151.001(a)(1). Because parental rights include the rights of a possessory conservator, we hold the Department's request for termination of Louis's parental rights encompassed a request to deny Louis possessory conservatorship. *See id.* We overrule Louis's second issue.

## MANAGING CONSERVATORSHIP

In two issues, Dorothy B. appeals the trial court's denial of her request for sole managing conservatorship. She argues there was legally and factually insufficient evidence "for the trial court to find that [her] request for relief should be denied." She also argues the trial court erred by failing to admit a Kinship Caregiver Home Assessment that the Department completed after a home study.

### A. Sole Managing Conservatorship

"The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." TEX. FAM. CODE ANN. § 153.002 (West 2014). Courts may use the nonexhaustive list of *Holley* factors previously listed to determine the child's best interest. *In re W.M.*, 172 S.W.3d 718, 725 (Tex. App.—Fort Worth 2005, no pet.).

We review a trial court's determination of conservatorship for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if its decision is arbitrary and unreasonable. *Id.* The trial court did not file any separate findings of fact and conclusions of law supporting its conservatorship finding in the decree. "When no findings of fact or conclusions of law are filed in a bench trial, the trial court's judgment implies all findings of fact necessary to support it," but a party may challenge the trial court's implied findings "by raising both legal and factual sufficiency of the evidence points." *In re W.M.*, 172 S.W.3d at 725. "An abuse of discretion does not occur as to factual matters as long as some evidence of a substantive and probative character exists to support the trial court's decision." *Id.*

"Legal and factual sufficiency are not independent grounds for review in conservatorship cases, but they are relevant factors in deciding whether an abuse of discretion occurred. In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion?" *Id.* Our traditional standards of review for legal and factual sufficiency come into play with regard to the first question. *Id.* With regard to the second question, we determine, based on the admitted evidence, whether the trial court made a reasonable decision. *Id.*

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.* So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *Id.* at 822. The trier of fact is the sole judge of the credibility

of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822. In a legal sufficiency challenge by a party with the burden of proof at trial, we examine the entire record to determine if the proposition contrary to the finding is established as a matter of law. *Pike-Grant v. Grant*, 447 S.W.3d 884, 886 (Tex. 2014). Only if the contrary proposition is established as a matter of law will we sustain the issue. *See id.*

In reviewing a factual sufficiency point, we consider all of the evidence supporting and contradicting the finding. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989) (per curiam). We set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In a bench trial, the trial court as factfinder is the sole judge of the credibility of the witnesses. *Sw. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

*1. The Evidence Regarding Dorothy B.*

Garza, the CPS investigator, had concerns about the cleanliness of Dorothy B.'s home. "There w[as] . . . a strong foul odor in the home" as well as "several piles of trash in certain areas. She had some animals out there as well. Directly in front of her porch there was several boxes, clutter, that were accessible to the children." Garza told Dorothy B. that she needed to clean up her home, and Dorothy B. made some improvements.

Maria Spenrath, a legal worker for the Department, testified the children were brought into the Department's care due to continued drug use by Dorothy Denee, and the children were initially placed with Dorothy B. Spenrath visited Dorothy B.'s home and had concerns about the cleanliness of the kitchen because there was trash on the floor and a big trash bag that "you could see . . . a dog or something in the home had gone to the bathroom on the bag." She testified that outside of

the home there was a very long, machete-type knife, which the children could reach. Spenrath testified the rest of Dorothy B.'s home was relatively clean.

Elementary teacher Jones testified that while A.J.C. was living with his grandmother, there were several days when he brought a blanket and pillow to class that smelled of animals or feces. She also said A.J.C. was dirty a lot of the time and he would have feces on his clothes and in his socks and shoes. Jones stated that the school would "either send a note home for [the item] to be cleaned or washed or we would take it home and wash it ourselves" when Dorothy B. did not clean it. Jones testified she brought the problems to Dorothy B.'s attention, but Dorothy B. did not adequately address them. Specifically, Jones stated that after she would notify Dorothy B. of the problem, there would be an improvement for a couple days, but the problem would recur.

CPS caseworker Baker testified the children were removed from Dorothy B. because of the conditions of the home. She testified about "an extremely bad, foul smell" in Dorothy B.'s home, the children were dirty, trash bags were everywhere, and one of the dogs "had a prolapsed anus that whenever he got excited he would bleed all over the place and . . . he was going all over the furniture." Baker stated Dorothy B. told her she had tried several times "to have that fixed . . . and it was time to have it fixed again." Baker further testified there were two or three cats and "on occasion geese would fly in." Baker was concerned about where the kids would sleep because she did not see any linens. She stated, "Blankets were on the floor along with dirty clothes, trash in piles all over the place."

Dorothy B. testified she was a registered nurse who had a degree in child development. She stated there was only one time when the school contacted her about the cleanliness of the children. She testified that after the children were placed with her, they went to school and "they always had clean clothes to go to school in." She responded to Jones's testimony by stating:

> I'm not sure what that teacher was referring to. I'm assuming it was before they were in my care. The only time that [A.C.] had any trouble was they had clean shoes to wear to school and dirty shoes to wear at home and that day he put on his dirty shoes and I guess he must have stepped on something. We've got almost like a quarter-mile driveway and I guess he stepped in something on the way up there. I've done it myself going to work, so I have to clean my shoes sometimes when I get to work but, you know, that's just part of living out there.

She further stated the children were "neat freaks" and liked to be dressed properly. Dorothy B. explained the children had a nightly routine of taking "baths, not showers. [J.F.B.] was the only one that knew how to do a shower." She testified, "I didn't know anything beforehand that there was even any trouble. They were always saying that everything was good and that the children were well cared for, so I was kind of surprised when they came and took the children. It was a big shock to me." She explained the condition of her home, stating that she was in the middle of remodeling it.

Dorothy B. admitted she suspected Dorothy Denee was using drugs, but Dorothy Denee would never admit it to her. Dorothy B. testified the children started to miss school because Dorothy Denee was not taking her medication, but she believed that Dorothy Denee was no longer using drugs. Dorothy B. explained Dorothy Denee had successfully completed rehabilitation and obtained a job at Wal-Mart.

Dorothy B. testified she took care of the dog's bleeding issue and now has only dogs and horses at home. She stated that when she had visits with the children, she did activities with them such as helping them with homework, drawing, and taking pictures. She testified she corrected all of the issues raised by Baker.

*2. Analysis*

The evidence shows that the children, especially J.F.B., were bonded with Dorothy B. However, the only direct evidence about J.F.B.'s desires were that he wanted to live with his

mother and did not want to be separated from his siblings. There was no evidence about the desires of E.C. or A.J.C. with respect to Dorothy B.

The evidence in the record shows that after the children were removed from Dorothy Denee and placed with Dorothy B., the children were removed from Dorothy B. Jones testified A.J.C. came to school dirty many times, brought a blanket and pillow that smelled of animals or feces, and he would have feces on his clothes and "in his socks and shoes." She also testified she notified Dorothy B. of the problem, and Dorothy B. would address the problem for a couple of days but then allow the problem to recur. Garza, Spenrath, and Baker testified they all had concerns about the cleanliness of Dorothy B.'s home, the animals, and the fecal matter in the home.

Dorothy B. testified there was only one incident when the school informed her about a problem with the children's cleanliness and that the children "always" had clean clothes. She suggested that one of the children "must have stepped in something" while walking down the driveway. Dorothy B. further explained the clutter in her home was the result of home remodeling and that she fixed her dog's "bleeding issue."

The trial court heard conflicting evidence about whether Dorothy B. provided, and was willing or able to provide, clean clothes and a clean home for the children. Dorothy B.'s testimony that there was only one incident at school was contradicted by elementary teacher Jones's testimony that there was more than one occasion on which A.J.C. came to school with clothes or items smelling of fecal matter. As the factfinder in this case, the trial court was the sole judge of the credibility of the witnesses. *See id.*

Dorothy B. did not conclusively establish that it was in the children's best interest that she be appointed managing conservator. *See Pike-Grant*, 447 S.W.3d at 886. Having considered all of the evidence supporting and contradicting the trial court's implied finding that appointment of Dorothy B. as managing conservator was not in the children's best interest, we cannot say the

finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. Therefore, we hold the trial court did not abuse its discretion by not appointing Dorothy B. as sole managing conservator.

## B. Exclusion of the Kinship Caregiver Home Assessment

At trial, Dorothy B. requested that the trial court admit and take judicial notice of the Kinship Caregiver Home Assessment, which the Department completed after conducting a social study of her residence. The Department objected to the admission of the report, and the trial court sustained the Department's objection.

The social study was conducted in December 2013, after the Department placed the children with Dorothy B. The vast majority of the report consists of comments made by Dorothy B. The report considered several potential risk factors, including safety, the caregiver's motivation, permanency, and references. The overall risk finding indicated "No Significant Factors." The report also stated, "Dorothy B. has a clean and sanitary three bedroom and one bathroom trailer . . . ." The report found Dorothy B. had the following strengths, she (1) "has an established bond with her grandchildren and an understanding of the extent of their abuse"; (2) "has an understanding of the pattern of negative family dynamics that her grandchildren were exposed to and agreed to be protective and not permit contact with their biological parents without the consent of CPS and/or the Court"; (3) "knows [the children's] health, social, genetic, and educational history"; (4) "is an experienced parent and currently has her grandchildren placed with her"; (5) "is requesting to be the primary caregiver and adopt her grandchildren if parental rights are terminated"; (6) "has transportation to take her grandchildren to appointments as well as for safety in the event of an emergency situation"; (7) "has no documented diagnoses of mental health issues"; and (8) "has adequate space in her residence for her grandchildren to comfortably reside." The report identified two concerns: she (1) "has no income of her own. . . .[and] relies on the

financial assistance from her mother and the government"; and (2) "is a single parent to her four grandchildren."

Dorothy B. argues the error was harmful because the trial court opined as follows:

I want to add that this Court finds that compelling evidence was presented during this trial that the children were subjected to systemic and consistent neglect while in her care and that I specifically find that [Dorothy B.'s] testimony was self-serving and lacked credibility. I also have serious concerns about any plan for the children that would involve her as a major support system for the children and I'd like to add that I find it astonishing that the Department allowed the children to remain in her home for as long as they did. It's inexcusable to me given the very compelling testimony that was offered in this case as to the neglect that they were experiencing on a daily basis and the conditions of her home and the failure to adequately address those concerns in a prompt and expeditious manner.

The Department argues that even if the trial court erred by not considering the assessment, the error was not harmful.

"To obtain reversal of a judgment based on error in the . . . exclusion of evidence, an appellant must show that the trial court's ruling . . . probably caused the rendition of an improper judgment . . . ." *In re E.A.G.*, 373 S.W.3d 129, 144 (Tex. App.—San Antonio 2012, pet. denied) (citing TEX. R. APP. P. 44.1). "In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record, . . . ." *Id.* Although the trial court may consider the "findings and conclusions" of the social study, "the trial court may further use his discretion in determining the weight to be given to it." *Green v. Remling*, 608 S.W.2d 905, 909 (Tex. 1980).

The findings do not contradict the evidence that Dorothy B. was unable to consistently provide a sanitary home for the children. As the Department points out, the social study was conducted in the first part of December 2013, which was soon after the children were placed with Dorothy B. and about three months before the Department removed the children from Dorothy B.'s care. The report identified concerns such as Dorothy B.'s financial situation and being a single

parent to four children. Elementary teacher Jones and counsel Hamiter testified that A.J.C. was coming to school smelling of fecal matter. Jones stated Dorothy B. would fix the problem for a couple days, but then the problems would recur. Garza, Baker, and Spenrath all testified about the unsanitary conditions of Dorothy B.'s home. The evidence admitted at trial about the conditions of Dorothy B.'s home reflects that the concerns expressed in the report—Dorothy B.'s financial issues and being a single parent caring for four children—had materialized, despite the strengths the Department had found. Furthermore, the Department's findings in the report were substantially based on statements from Dorothy B., who the trial court did not find credible at trial. Based on our review of the entire record, we cannot say the trial court's failure to admit the report or to consider the Department's findings in the social study report probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1. Thus, we hold any error in failing to admit or consider the excluded evidence was not harmful.

## CONCLUSION

We affirm the trial court's judgment.

Luz Elena D. Chapa, Justice